# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
CASE NO.:  4:25-cv-00219-AW-MAF

MARION P. HAMMER,

    Plaintiff,

vs.

NATIONAL RIFLE
ASSOCIATION OF AMERICA,

    Defendant.

_____/

VIDEORECORDED
DEPOSITION OF:    MARION HAMMER

DATE:    TUESDAY, MARCH 17, 2026

TIME:    8:58 A.M. - 11:03 A.M.

PLACE:    REGUS - TALLAHASSEE
    101 NORTH MONROE STREET
    SUITE 800
    TALLAHASSEE, FLORIDA  32301

STENOGRAPHICALLY
REPORTED BY:    GREG T. SMITH

Job No. CS7904026

Page 2

A P P E A R A N C E S:

RICHARD E. COATES, ESQUIRE

OF: COATES LAW FIRM, PL

    115 EAST PARK AVENUE

    SUITE 1

    TALLAHASSEE, FLORIDA 32301

    (850) 681-1029, FAX-(208) 248-9038

    RCOATES@RCOATESLAW.COM

    APPEARING ON BEHALF OF THE PLAINTIFF

BRIAN L. HAYDEN, ESQUIRE

OF: JACKSON LEWIS, PC

    501 RIVERSIDE AVENUE

    SUITE 902

    JACKSONVILLE, FLORIDA 32202

    (904) 638-2655, FAX-(904) 638-2656

    BRIAN.HAYDEN@JACKSONLEWIS.COM

    APPEARING ON BEHALF OF THE DEFENDANT

JEREMY S. SCHNEIDER, ESQUIRE

OF: JACKSON LEWIS, PC

    11790 SUNRISE VALLEY DRIVE

    SUITE 400

    RESTON, VIRGINIA 20191

    (703) 483-8300, FAX-(703) 483-8301

    JEREMY.SCHNEIDER@JACKSONLEWIS.COM

    APPEARING ON BEHALF OF THE DEFENDANT

ALSO PRESENT:

CHRIS REEVES -- VIDEOGRAPHER

Page 3

I N D E X

TESTIMONY OF MARION HAMMER

     DIRECT EXAMINATION BY MR. HAYDEN....................5

CERTIFICATE OF OATH...................................82

CERTIFICATE OF REPORTER...............................83


                        INDEX OF EXHIBITS

DEFENDANT'S EXHIBITS

EXHIBIT 1          COMPLAINT.............................35

EXHIBIT 2          COMPOSITE OF CONTRACTING DOCUMENTS....36

EXHIBIT 3          MARION P. HAMMER WOMAN OF DISTINCTION

                   ONLINE NOMINATION FORM................55


EXHIBIT 4          MARION P. HAMMER WOMAN OF DISTINCTION

                   AWARD QUALIFICATIONS..................64

EXHIBIT 5          NRA WOMEN FACEBOOK POST, DATED

                   7/10/23...............................76


                        ------

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We're now on the record.  The time now is 8:58 a.m., on March 17th, 2026.  This begins the videorecorded deposition of Marion Hammer, taken in the matter of Marion Hammer v. National Rifle Association of America from Florida; case number of which is 4:25-cv-00219-AW-MAF.

My name is Chris Reeves from the firm Veritext Legal Solutions; I am the videographer.  The court reporter is Greg Smith from the firm Veritext Legal Solutions.  I'm not authorized to administer an oath.  I'm not related to any of the parties in the action, nor am I financially interested in the outcome.

Counsel and all present in the room, please state your appearances and affiliations for the record.  If there are any objections to the proceeding, please state them at the time of your appearance, beginning with the noticing attorney.  Then the court reporter will swear in the witness.

MR. HAYDEN:  Brian Hayden, on behalf of the defendant National Rifle Association of America.

MR. SCHNEIDER:  Jeremy Schneider, from Jackson Lewis.  Same.

Page 5

MR. COATES:  Richard Coates, on behalf of Marion Hammer.

MR. HAYDEN:  And before we get started, if we could just have Ms. Hammer attach the microphone for the benefit of the court reporter and the videographer.

THE COURT REPORTER:  Ma'am, can you raise your right hand for me, please.

Do you swear or affirm that the testimony you are about to give in this cause will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT REPORTER:  Thank you.

MARION HAMMER,

having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HAYDEN:

Q.   Good morning, Ms. Hammer.  We met briefly before the deposition.  My name is Brian Hayden; I am the attorney of record for the defendant, National Rifle Association of America.

Will you understand me if I simply refer to the defendant as the NRA?

A.   Yes.

Page 6

Q.   Okay.  Could you please state your full name for the record.

A.   Marion Alberta Price Hammer.

Q.   And, Ms. Hammer, have you ever been known by a different name?

A.   What?

Q.   Have you ever been known by a different name?

A.   No.  I'm known as Marion Hammer.  And when I was -- before I got married, I was known as Marion Price.

Q.   Okay.  So your maiden name is Price.

So before we get started, I'd just like to go over a couple ground rules for the deposition so that we're both on the same page.  We're obviously being -- you're being videorecorded.  And we have a court reporter here today who's typing down everything that we say.  So if you would -- if you could answer my questions orally as opposed to with physical gestures. Sometimes people nod.  And I can see that.  But for the sake of the record and to make it clear --

A.   Okay.

Q.   And because we are creating a deposition transcript, will you agree to allow me to get my full question out before you answer the question?  And I'll do my best to allow you to answer the question before I

ask my next question.  Does that sound reasonable?

A.   Yes.

Q.   That way it will keep us from being -- talking over each other.  And it will make the court reporter's job easier.

A.   I'm not here to make his job easier.

Q.   I understand.

A.   I'm here to answer your questions.

Q.   Understood.

So if at any point, Ms. Hammer, you need a break, please just ask me.  We're not here to run a marathon.  We can take breaks as needed.  Does that sound reasonable?

A.   It sounds reasonable.  But you're wasting time.

Q.   Okay.  The one thing I ask before you take a break is if I'm in the middle of a question or in the middle of a line of questioning that you allow me to finish that before we take a break.  Does that sound reasonable?

A.   We're not going to take any breaks.

Q.   I understand you want to go straight through. We'll see how that goes.  But if I'm in the middle of a question or in a line of questioning, do you agree to finish --

A.   Yes.

Page 8

Q.    -- that --

Okay.  Thank you.

Ms. Hammer, have you taken any alcohol, drugs, or medication that would --

A.    No.

Q.    -- that would impair your ability to testify accurately and truthfully this morning?

A.    No.  I don't take drugs.  And I don't drink alcohol at all.

Q.    Is there anything else going on in your life right now that would impair your ability to testify accurately truthfully this morning?

A.    Just you.

Q.    Ms. Hammer, can you tell me what you did to prepare for today's deposition, if anything?

A.    Nothing.

Q.    Did you -- aside from your attorney, did you speak with anyone in preparation --

A.    No.

Q.    -- for your deposition today?

A.    I did not even talk to him.  He scheduled it.  And that's it.

Q.    So I notice that you're answering before my question is fully finished.  I would ask --

A.    That's because you --

Page 9

Q.   I would ask that you allow me to finish my question before you answer.  Will you do that?

A.   No.

MR. HAYDEN:  Counsel, could you --

MR. COATES:  Marion, let him finish, please.  Just -- we'll get through it.

THE WITNESS:  He's stalling.

MR. COATES:  He'll get there.

BY MR. HAYDEN:

Q.   Ms. Hammer, did you review any documents in preparation for --

A.   No.

Q.   -- your deposition --

A.   I didn't.

Q.   -- this morning?

Will you allow me to finish my question before you --

A.   No.  Because it's obvious that you're stalling.

Q.   Ms. Hammer, can you tell us your date of birth, please?

A.

Q.   And where did you grow up, Ms. Hammer?

A.   I was born in Columbia, South Carolina, at home.

Q.   And where do you currently reside, Ms. Hammer?

Page 10

Where do you live?

A.    ▮▮▮▮▮▮▮▮▮▮▮▮   You know that.

Q.    And is that located ▮▮▮ in ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮

A.    Of course it is.

Q.    And do you own your own home?  Or do you rent?

A.    I own my own home.  Me and the bank.

Q.    And, Ms. Hammer, does anyone live with you at --

A.    No.

Q.    -- ▮▮▮▮▮▮▮▮▮▮

A.    Just my dog.  I have a King Charles Cavalier named Danny.  And she's at home in her kennel now.  And she doesn't know what's going on.  Because I haven't left the house in over a year.

Q.    Are you married, Ms. Hammer?

A.    No.

Q.    Were you married at some point?

A.    I was.

Q.    And to whom were you married?

A.    You're wasting time.

Q.    We can get through it quicker, Ms. Hammer, if you just answer my questions.

To whom were you --

A.    I'm not answering your stupid questions.

Page 11

MR. COATES:  We'll take a break.

MR. SCHNEIDER:  We'll step out.

THE VIDEOGRAPHER:  Do you want to go off the record?

MR. SCHNEIDER:  Yeah.

THE VIDEOGRAPHER:  The time now is 9:06 a.m. We're off the record.

(Brief recess.)

THE WITNESS:  The time now is 9:07 a.m.  We're back on the record.

BY MR. HAYDEN:

Q.   Ms. Hammer, you stated that you were married. Can you state for the record to whom were you married?

A.   I told you I wasn't answering these questions. If you're smart enough, you can figure that out.

MR. HAYDEN:  So, for the record, if needed, I'm going to have to address it with the Court if we need to come back --

MR. COATES:  Understood.

MR. HAYDEN: -- ma'am, for some of these questions.  And --

THE WITNESS:  I'm married to Clifford Arthur Hammer.

BY MR. HAYDEN:

Q.   And, Ms. Hammer, do you have any children?

Page 12

A.    I have three children.

Q.    And what are --

A.    Rhonda, Colleen, and Sally.

Q.    Can you --

A.    Sally is deceased.  And her daughter Kayla takes care of me.

Q.    Can you state their full names, please. Sally --

A.    Sally Ann Hammer.

Q.    And you stated that she's deceased.

The other two children -- what are their full names?

A.    Kayla Mason Hammer takes care of me.

Q.    Okay.  And who else?

A.    Eric.

Q.    And what's his last name?

A.    Hammer.

Q.    Ms. Hammer, I'd like to ask you just --

A.    And he's disabled.

Q.    Understood.

I'd like to ask you a few questions about your educational background.  Can you tell me -- where did you get your undergraduate degree?

A.    University of Georgia in Atlanta in 1956.

Q.    And what degree did you obtain from the

Page 13

University of Georgia?

A.   General degree.

Q.   A general degree?  Is that a major -- like, business?  Did you major in a specific field?

A.   Back then, it was just a general degree.

Q.   Okay.  And that's a bachelor's degree?

A.   Yes.  Two years.

Q.   Was it an associate's or a bachelor's degree, if you know?

A.   Associate's.

Q.   Okay.  Beyond your associate's degree, have you obtained any other degrees --

A.   No.

Q.   -- your education --

A.   Goddamn it.

MR. COATES:  Settle down.  Let's get through it.

THE WITNESS:  He's an asshole.

BY MR. HAYDEN:

Q.   Ms. Hammer, aside -- do you currently have a driver's license?

A.   Yes.  I just showed it to him.  Weren't you paying attention?

Q.   Aside from your driver's license, do you have any other licenses?

Page 14

A.   I don't know.

Q.   Okay.  Do you possess any vehicles?

A.   No.

Q.   Have you ever served in the military or armed forces, Ms. Hammer?

A.   No.

Q.   Have you ever been convicted of a crime --

A.   No.

Q.   -- punishable by death or --

A.   No.

Q.   -- imprisonment --

A.   No.  I've never been convicted of a crime. Period.  I've never committed a crime.

Q.   Do you currently have any criminal charges pending against you?

A.   No.

Q.   Now, Ms. Hammer, aside from this lawsuit, have you filed a lawsuit against any other entity?

A.   No.  Nobody has treated me the way NRA has treated me.

Q.   You've never been involved in another lawsuit?

A.   No.

Q.   Does the name of the lawsuit Hammer v. Sorenson ring a bell to you?

MR. COATES:  We want to clarify for the record

Page 15

that -- the stalking case.  The cyber attorney or whatever he was from California after Parkland.

THE WITNESS:  I've not been involved in a lawsuit.

BY MR. HAYDEN:

Q.   None that you can recall at this time?

A.   That I can remember.

Q.   Do you recall ever filing an ethics complaint with the Florida Commission on Ethics?

A.   I can't remember.

Q.   Do you recall filing a complaint against the Florida legislature?

A.   I can't remember.

MR. COATES:  She never did.

BY MR. HAYDEN:

Q.   Have you ever filed for bankruptcy, Ms. Hammer?

A.   No.

Q.   So your testimony today then is that this lawsuit is the only lawsuit you can recall ever being involved in?  Is that --

A.   Yes.

Q.   -- your testimony?

A.   That's my testimony.  That's all I can remember.

Im 87 years old.  And you're a pain in my rear

Page 16

end.  You think you're a big deal.  I think you're stalling.

Q.    Before I get into questions about your lawsuit, Ms. Hammer, I do want to learn a little bit about your work history.  So I understood that --

A.    No.

Q.    -- involved with the NRA --

A.    This is a deposition.

Q.    And so my question to you is:  Separate and apart from any work that you've done with the NRA -- after you graduated college, did you hold a job with any other entity?  What was your first job after college?

A.    I don't remember.  I'm 87 years old.

Q.    Aside from working with or for the NRA in any capacity, have you held any other jobs as a working adult?

A.    I did.  I told you I don't remember.

Q.    You don't remember?  So your testimony is you don't remember holding a single job as a working adult separate and apart from working with the NRA?

A.    Correct.

Q.    Ms. Hammer, since 2017 -- I don't want to go back further than that.  But since 2017, have you kept a diary or written record about events that have occurred in your life?

Page 17

A.   No.

Q.   So no diary at all?  You --

A.   No.  When I say no, I mean no.

THE WITNESS:  Who is this asshole?

MR. COATES:  He represents the NRA.  So we'll get --

THE WITNESS:  He represents a bunch of assholes.  And if Mike Blaz -- the attorney who thinks he's a big deal -- wrote these questions, I apologize to you.

BY MR. HAYDEN:

Q.   Ms. Hammer, do you have a personal email account?

A.   I have one email account.

Q.   And what is that email account, if you can tell me please?

A.   You know what it is.

Q.   For the purposes of the deposition and the record, can you tell us what your email account --

A.   No.  I will not.

MR. HAYDEN:  Counsel --

MR. COATES:  It's -- Marion, just tell him what it is.  We all have it.

THE WITNESS:  ████████████

MR. HAYDEN:  Thank you.

Page 18

BY MR. HAYDEN:

Q.   And how long have you had that email address, Ms. Hammer?

A.   As long as there's been an internet.

Q.   So over 20 years at least; is that accurate?

A.   Yes.  It's the only one I've ever had.

Q.   All right.  Ms. Hammer, I'd like to switch gears a little bit and ask you about the NRA.  Can you tell me what's your understanding of the NRA's mission?

A.   The NRA's mission is to protect the right of people to keep and bear arms.

Q.   And do you understand -- what's your understanding of the NRA's goals, if it has any?  What do you understand them to be?

A.   NRA or ILA?

Q.   Well, I'll ask you about the ILA in a moment. But the NRA -- what do you understand the NRA's goals to be?

A.   I don't work for NRA.  I work for ILA.

Q.   Can you tell me what is the ILA.

A.   The Institute for Legislative Action.  When Harlon Carter called me personally in 1975 right after I moved to Tallahassee, he asked me to kill a bill before the legislature.

Q.   What --

Page 19

A.   And he said they would work out some payment plan.  But they never did.

Q.   What's the relationship between the NRA and the ILA?  How are they related, if you can tell me?

A.   They're one and the same.

Q.   Can you explain for me what that means -- they're one and the same?

A.   If you don't know, then you shouldn't be sitting here asking questions.

Q.   Well, my question is so that you can explain to the jury or anybody else who might not be familiar with what the ILA is.  Can you tell us what the ILA is and how it's related --

A.   The ILA is supposed to handle legislative matters.

Q.   On behalf of the NRA?

A.   Yes.  And its members.

Q.   And this is a separate legal entity as far as you understand?

A.   Yes.  It was created by Harlon Carter.

Q.   And is it an affiliate of the NRA?  Do you know?

A.   No, it's not.  It's separate from NRA.

Q.   Okay.  And what's the mission or goal of the ILA?

Page 20

A.    The mission and goal is to protect the right of its members and the public to keep and bear arms.

Q.    Now, if I ask you did you work for the NRA or the ILA, what's your answer?

A.    Harlon Carter asked me to do the business.  And then Neal Knox was the executive director of ILA.

Q.    Okay.  So who is Harlon Carter?

A.    Harlon Carter was the man.  He was the CEO of NRA.

Q.    When was he the CEO of the NRA?

A.    Hell if I know.  When I started.

Q.    Okay.  Back in the '50s?  '60s?

MR. COATES:  '70s.

BY MR. HAYDEN:

Q.    '70s?

A.    In the 1970s --

Q.    Okay.

A.    -- he became EVP.

Q.    And Neal Knox you said was the president of the ILA?  Is that right?

A.    There's no president.  There's executive director.

Q.    Okay.  So he was executive director of the ILA?

A.    Yes.

Q.    Did Neal Knox work for Harlon Carter?

Page 21

A.    Yes.

Q.    And did you work for Neal Knox?

A.    Yes.

Q.    And when did you start working for Neal Knox and the ILA?  Was that in the seventies, Ms. Hammer?

THE WITNESS:  I'm not sitting here for this bullshit.

MR. COATES:  Sit tight.  Let's get through it.

THE WITNESS:  If he can't answer -- he's asking stupid questions.

MR. COATES:  Just need you to answer them.

MR. HAYDEN:  Ms. Hammer, if you could put your microphone back on, please.

THE WITNESS:  Kiss my butt.

MR. COATES:  Marion --

THE WITNESS:  I'm 87 years old.  And I can hold it right here.

MR. HAYDEN:  Are you able to pick up?

THE VIDEOGRAPHER:  It's fine.

BY MR. HAYDEN:

Q.    Okay.  Ms. Hammer, can you tell --

A.    I don't know who the hell you are or who you think you are.  But I've never seen you or heard of you before.  And, obviously, these questions were prepared for you.  And you're just another BS-er.

Page 22

Q.   So, Ms. Hammer, my question, again, is -- I'm trying to understand when you started working for the ILA and Neal Knox.  Was that in the '70s?

A.   Yes.

Q.   Okay.  And when you started working for the ILA, what was your first job position with them?

A.   I was the lobbyist for them.

Q.   And were you an employee of the ILA?

A.   I was.  I took direction from them.

Q.   Okay.  And can you walk me through the different job positions that you held with the ILA over the years starting with --

A.   No.

Q.   -- starting with your first --

A.   No.

Q.   Ms. Hammer, this is your lawsuit.  And you sued the NRA.  And I'm trying to understand what your affiliation is with the NRA --

A.   That's because whoever wrote those damn questions doesn't know squat.  And you don't know anything except what the questions somebody fed you.

Q.   So I know you have a lot more information about your affiliation with the NRA and ILA, which is why I'm asking you the questions.  And the reason I'm asking you the questions is also so that you can explain to me and

Page 23

the jury and other people who might not be familiar with the ILA and your affiliation.  If you can explain to us what that is.

So, again, I'll ask you:  What are the different job positions you held with the ILA over the years?

A.   I've been a lobbyist forever.

Q.   And is the lobbyist position the only job position that you held with the ILA?  Or did you --

A.   Yes.

(Brief interruption.)

MR. COATES:  Marion, sit still.  Take a chill.

THE WITNESS:  I'm not putting up with this bull crap any longer.  He's an ass.

MR. COATES:  Can you not continue?

THE WITNESS:  I'm not going to continue.  If you have any important questions, ask them.  But if you think I'm going to answer all those questions, you're out of your mind.  Mike Blaz prepared them. And he thinks he's a big damn deal.

BY MR. HAYDEN:

Q.   For the record, Ms. Hammer, you have brought a lawsuit against the NRA.  We're entitled to take your deposition and ask you questions --

A.   You're not entitled to anything.

Page 24

Q.   And so if you're going to prosecute your lawsuit and continue with it, we're going to ask the Court that the Court order you to answer questions.  I don't want to have to do that.  Are you willing to answer our questions this morning?

A.   Just shut the hell up.  I want to talk to my lawyer.

MR. SCHNEIDER:  Why don't we take --

MR. COATES:  Yeah.  Please.

MR. SCHNEIDER:  We'll step out.  Let's go off the record.

THE VIDEOGRAPHER:  The time now is 9:25 a.m. We're off the record.

(Brief recess.)

THE VIDEOGRAPHER:  The time now is 9:29 a.m. We're back on the record.

BY MR. HAYDEN:

Q.   All right.  Ms. Hammer, for the record -- just trying, you know, to get through some background questions.  We've all got a job to do.  So I'm doing my best just to kind of get through them with you.  And I think we'll be here a much shorter time if you can just allow me get through the questions and you answer to the best of your recollection, we'll be able to get through this much speedier.

Page 25

A.    You're stalling.

Q.    So just for clarification -- my understanding is the only job position you say you held with ILA was as a lobbyist; is that right?

A.    Correct.

Q.    Okay.  And can you tell me from approximately what year until when did you hold a position as a lobbyist with the ILA?

A.    When Harlon Carter called me in 1975.

Q.    Okay.  1975.

And what's the last year you stopped working as a lobbyist for the ILA?

A.    When they called.  And Randy Kozuch called and told me to pack up and leave -- that they didn't need me anymore.

Q.    Okay.  You said Randy Kozuch called you and told you that?

A.    Yes.

Q.    Who is Randy Kozuch?

A.    He was the executive director of ILA at the time.

Q.    And when was that?

A.    Couple years ago.

Q.    In 2024?  Does that sound right, if you can recall?

Page 26

A.   I can't recall.

Q.   Okay.  We'll show you some documents a little bit later.

Can you tell me what were your primary job duties as a lobbyist for the ILA?

A.   To see to it that no legislation passed that would impair the right of the people to keep and bear arms.

Q.   And when you say no legislation would pass -- did you operate primarily in Florida?

A.   Yes.

Q.   Did you operate in any other states other than Florida?

A.   Yes.

Q.   Where else?

A.   If you don't know, I'm not telling you.

Q.   Ms. Hammer, the purpose of my questions is to make a record and for you to explain to myself and the jury where you worked and what your job duties were.  So can you tell me --

A.   I worked with Tara Reilly in Texas.  I worked in Georgia.  Different states.

Q.   Okay.  So Texas, Georgia, Florida -- were those the primary states where you --

A.   Primary states.  Yes.

Page 27

Q.   Okay.  And you operated from approximately from 1975 to 2024?  Would you say that's about accurate?

A.   Yes.  Goddamn it.

Q.   Ms. Hammer, were you ever a member of the NRA board of directors?

A.   Yes.

Q.   All right.  Can you tell me when.

A.   From 1982 until I resigned in 19 -- in 2024, I think.

Q.   And was that a paid position as a --

A.   No.

Q.   -- director --

A.   Volunteer.  I got on the board because Harlon Carter asked me to.  Because he said that the NRA board needed somebody who understood the workings of legislative matters.

Q.   Did you serve on any committees on the NRA board of directors?

A.   Yes.

Q.   Which committees did you serve on?

A.   I can't remember.  Ethics committee and legislative policy are the ones -- primary ones that I remember.

Q.   Okay.  And approximately when did you serve on the ethics committee?

Page 28

A.    Forever.

Q.    Well, between 1975 and 2024 -- did you serve on the ethics committee that whole time?  Or was there --

A.    I don't remember.

Q.    Okay.  Do you remember the last year you served on the ethics committee?

A.    No, I don't.

Q.    What about the legislative policy committee? When did you serve on that?

A.    The whole time.

Q.    Can you tell me -- what's the NRA executive council?

A.    What?

Q.    What is the NRA executive council?

A.    I don't know.  And they don't know.  And Mike Blaz pretends to know.  But it's whatever he decides.

Q.    Can you give me a general understanding of what you --

A.    No.

Q.    -- understand the executive council to be?

A.    No.  Because I didn't work with them.

Q.    Okay.  Have you ever been a member of the NRA executive council?

A.    What are you talking about?

Q.    And if you don't know, that's fine.  But have

Page 29

you ever -- do you know if you have ever been a member of the NRA executive council?

A.   What is the executive council?

Q.   Well, I'm assuming since you don't know that you don't know if you were a member.  Is that accurate?

A.   Yes.

Q.   Okay.  Can you tell me, Ms. Hammer, what are some key pieces of legislation that you worked on here in Florida when you were a lobbyist for the ILA?

A.   I can't remember.

Q.   Do you remember anything of them?

A.   No.

Q.   Maybe the most significant piece of legislation that --

A.   No.  No means no.

Q.   Does stand your ground ring a bell?

A.   I worked on stand your ground.

Q.   Okay.  What is that?

A.   I don't know.

Q.   Do you recall when you worked on that piece of legislation?

A.   Forever.

Q.   Do you recall with any more specificity than that?

A.   No.  No means no.  When I tell you no, it means

Page 30

no.

Q.   Do you know what the Eddie Eagle's Gun Safe Program is?

A.   I created it.

Q.   And what is that?

A.   It's a program that's taught in school for young children to not touch guns that they might see carelessly laying around.

Q.   Okay.  So child safety program to --

A.   Yes.

Q.   -- teach them about guns?

A.   Yes.

Q.   And when did you create that program?

A.   In the beginning when it was created.

Q.   Do you recall about when that was?

A.   No.  I'd have to think about it.

Q.   Were you compensated at all for creating the Eddie Eagle --

A.   No.  I wasn't compensated.  Period.  NRA has never paid me what they owed me.

Q.   Were you supposed to be paid for your work with regard to the Eddie Eagle Gun Safe Program?

A.   Yes.

Q.   How much were you supposed to be paid?

A.   I don't know.  We never arrived at a figure.

Page 31

Q.   Okay.  When were you told you were supposed to be paid for your work on the Eddie Eagle Gun Safe Program?

A.   When it was put in place.  You don't seem to understand.

Q.   Well, that's why I'm asking you questions -- so I can understand.

A.   Your questions don't lead you to understand squat.

Q.   So can you tell me -- again, my question is: When were you told that you were going to be paid for your work on the Eddie Eagle Gun Safe Program?

A.   Harlon Carter.

Q.   So that's who.  I'm asking when.

A.   Before I created it.

Q.   Okay.  And about when did you create that?

A.   I'd have to stop and think about it.

Q.   Are you able to think about it now and --

A.   No.

Q.   Okay.  Ms. Hammer, did you ever serve as president of the NRA?

A.   Yes.

Q.   What years were you president of the NRA?

A.   I can't remember.

Q.   Do you remember approximately?

Page 32

A.   No.

Q.   If I said 1995 to 1998, does that sound about right?

A.   It sounds good.

Q.   Okay.  Any reason to believe that that's inaccurate?

A.   1995 -- Tom Washington died.  And I took his place.  I was first VP when he died in the hunting camp at the end of 1975, I think.  And then I was sworn in and elected in 1976.  And I served two years.

Q.   You said 1976.  Did you mean 1995?

A.   1976.

Q.   All right.  Ms. Hammer, as best you can recall, that's your testimony?

A.   Yes.

Q.   All right.  What were your primary job duties as president of the NRA?

A.   My primary job duties as president of NRA -- I don't recall.

Q.   You were the first female president of the NRA; is that right?

A.   Correct.

Q.   Would you agree with me if I said that that's a historically significant event?

A.   Yes.

Page 33

Q.   Would you agree with me if I said that that's a newsworthy event?

A.   Yes.  The media had a field day.  And they wouldn't leave me alone.

Q.   And that's something that you're proud of; right?  Having been the first female president of the NRA -- a historical achievement, newsworthy event -- that's something you're proud of?

A.   Yes.

Q.   Can you tell me what key initiatives or achievements did you bring about as president of the NRA?  What are you most proud of?

A.   I'm proud of having held the office.

Q.   Okay.

A.   And that's all I can remember.  You don't seem to understand that I have a memory problem.

Q.   When you say you have a memory problem, what do you mean?

A.   I'm 87 years old.  It's hard for me to remember anything.  In fact, your name -- I can't remember your name.

Q.   So would you agree it's hard for you to remember events that occurred and conversations that occurred?

A.   Certain things I remember and stand out.  And

Page 34

things that I don't, I don't remember.

Q.   Okay.  You'd agree with me, though, that there are absolutely things that --

A.   What?

Q.   -- you've forgotten; correct?

A.   I didn't hear.

Q.   Would you agree that there are certain things in your tenure as president of the NRA and your work with the NRA that you have forgotten?

A.   Yes.

Q.   Do you remember when your presidency with the NRA ended?

A.   It ended in -- I don't recall.

Q.   After your presidency with the NRA ended, did you continue to hold any other positions with the NRA other than president?

A.   I was on the legislative policy committee.

Q.   Okay.  And did you have a title on that committee?  Or --

A.   I don't remember.  What part of I don't remember don't you understand?

Q.   Can you tell me, Ms. Hammer, if you can recall, what awards or honors have you received from the NRA over the years?

A.   I don't know.

Page 35

Q.   Can you recall any?

A.   No.

MR. HAYDEN:  All right.  Ms. Hammer, I'm going to hand you -- do we have exhibit stickers?

THE WITNESS:  Don't hand me anything.

THE COURT REPORTER:  I have some.

MR. HAYDEN:  If I can get about three sheets.

THE COURT REPORTER:  Sure.

MR. HAYDEN:  Thank you.

Ms. Hammer, I'm giving you what I marked as Exhibit 1 to your deposition.

(Defendant's Exhibit No. 1 was marked for identification.)

THE WITNESS:  I sat down and drafted this.

BY MR. HAYDEN:

Q.   This is the Complaint that you filed in this lawsuit; is that right?

A.   Yes.

Q.   Did you read it before your attorney filed it on your behalf with the Court?

A.   He sent it to me.  I don't recall reading all of it.

Q.   Do you believe you read all of it before it was filed?

A.   Yes.

Page 36

Q.   Okay.  To the best of your knowledge, did it include any false or inaccurate statements?

A.   No.

Q.   And to the best of your knowledge as you sit here today, does it include any false or inaccurate statements?

A.   I just answered your question.  I said no. What part of no don't you understand?

THE WITNESS:  I'm not putting up with this.

MR. COATES:  Just a little bit longer, please.

THE WITNESS:  You're stalling.  And you're just trying to...

MR. HAYDEN:  Ms. Hammer, I'm handing you what I marked as Exhibit 2 to your deposition.

(Defendant's Exhibit No. 2 was marked for identification.)

MR. HAYDEN:  I'll represent to you --

MR. COATES:  Are you going to -- hang on first. Are you going into the contract?

MR. HAYDEN:  A few questions.  Yeah.

MR. COATES:  No.

MR. HAYDEN:  Yes, sir.

MR. COATES:  Her counsel in that Count I is in Virginia.  And he was not noticed.  And he's not here.

Page 37

MR. HAYDEN:  I've got questions about the contract.  You have allegations in the Complaint that are incorporated into the claims that we're defending.  And we --

THE WITNESS:  I'm not answering your goddamn questions.

BY MR. HAYDEN:

Q.   And before I get to Exhibit, 2 Ms. Hammer, I do want to go back --

A.   You can skip it.

Q.   -- Exhibit 1.

So do you see the title of Exhibit 1?  It's the Verified Complaint for Damages and Demand for Jury Trial.  Do you see that?

A.   I see it.

Q.   And if you could flip to page 22 of your Complaint for me, please.

A.   My pages aren't numbered.

Q.   It should be numbered at the bottom there.

A.   They're numbered at the top.  Page what?

Q.   Page 22.  Do you see where it says "Verification Pursuant to 28 USC Section 1746"?

A.   I see this.

Q.   Okay.  And you signed and dated that May 6 of 2025; is that correct?  Is that correct, Ms. Hammer?

Page 38

A.    Are you stupid?

Q.    I'll ask it again.  Did you sign and date this verification form on May 6th --

MR. COATES:  Just say yes.

MR. HAYDEN: -- 2025?

THE WITNESS:  I don't know.

BY MR. HAYDEN:

Q.    Is that your signature at the bottom of the page right above the typed --

MR. COATES:  Yes.

MR. HAYDEN:  -- "Marion P. Hammer"?

THE WITNESS:  Yes.

BY MR. HAYDEN:

Q.    Okay.  So you verified this Complaint; correct?

A.    Yes.

Q.    All right.  Thank you.

All right.  Ms. Hammer, I'd like to ask you some questions about Exhibit 2 to your deposition.  I'll represent to you that this is a composite --

A.    I'm not answering that.

Q.    -- consisting of various contracting agreements.  If you could turn --

A.    I'm not answering questions about the contract for you.

Q.    Your Complaint includes allegations about your

Page 39

agreement and your contract --

A.   Let's go.

Q.   -- with the NRA.

Are you refusing to answer questions?

A.   I'm leaving.  I'm sick.  I'm going to throw up on you.

Q.   So, for the record, Ms. Hammer, I'm telling you --

A.   For the record, I'm sick.

MR. COATES:  Are you having a medical issue, Marion?  Are you sick and we need to stop?  Are you not feeling well?

THE WITNESS:  I'm not feeling -- I'm going to throw up on him.

BY MR. HAYDEN:

Q.   If you leave, I'm going to have to move to the Court to reset your deposition.  And I'm going to be asking for reimbursement of costs and fees.  Do you understand that?

MR. COATES:  We can -- if you're sick, let me know.

If the witness is sick, then that's a different issue.  And we'll have to suspend it and try to work it out where you feel better.

MR. HAYDEN:  Well, please don't counsel the

Page 40

witness as far as what she's going to say.

MR. COATES:  I'm not counseling on what she's going to say.

BY MR. HAYDEN:

Q.  So, Ms. Hammer, do you understand if you leave and you refuse to answer my questions I'm going to go to the Court and I'm going to ask for reimbursement of costs and fees and reset your deposition?  Do you understand that?

A.  No.  I don't understand.

Q.  So will you answer my questions?

A.  No.  I will not answer your questions.

Q.  Are you refusing --

A.  Your questions are stupid.  And you didn't write the questions.  You did not, did you?  Did you write these questions?

Q.  Ms. Hammer, this is my opportunity to ask you questions.  I'm not answering your questions.  You're here to answer my questions.

MR. COATES:  He's not --

THE WITNESS:  He's -- he's not answering my questions.

MR. COATES:  He doesn't have to.

BY MR. HAYDEN:

Q.  So, Ms. Hammer, will you sit here for your

Page 41

deposition and allow me to ask you questions?  And will you answer them?

A.    No.

Q.    So are you refusing to continue?

A.    I'm refusing.

MR. COATES:  Are you sick?  Are you ill?

MR. SCHNEIDER:  Take a break.

MR. HAYDEN:  We'll take a break.  We'll go off the record.

THE VIDEOGRAPHER:  The time now is 9:50 a.m. We're off the record.

(Brief recess.)

THE VIDEOGRAPHER:  The time now is 9:55 a.m. And we're back on the record.

BY MR. HAYDEN:

Q.    Ms. Hammer, I'd like to direct your attention back to Exhibit 1 to your deposition, please.  If you could turn to paragraph 52 of your Verified Complaint, please.  And that's on page 13.  So paragraph 52.

Okay.  Are you there, Ms. Hammer?

A.    I'm here.

Q.    So paragraph 52 -- for the record, it reads, "Since the NRA's breach of the contract on or about April 22nd, 2024, the NRA has continued to use Plaintiff's name, image, and likeness without

Page 42

Plaintiff's consent."  Do you see that?

A.   Yes.  I never gave them permission ever to use my name or my likeness to promote NRA or any of its programs.

Q.   Okay.  And you say since the breach of the contract that you claim that the NRA has used your name, image, and likeness against -- without your consent.  Is that your testimony?

A.   Correct.

Q.   Okay.  Now, prior to your contract ending, they used your name, image, and likeness with your consent; right?  And then once they --

A.   No.  They never asked me for permission.  They were supposed to pay me, and they didn't.

Q.   Now, you claim that they continued to use your name, image, and likeness.  So they used your name, image, and likeness before your contract ended; is that right?

A.   Yes.  Before they summarily ended my contract, which they had no right to do.

Q.   And before they ended your contract, you had no problems with them using your name, image, and likeness while your contract was in place; is that right?

A.   I don't know.

Q.   Okay.  But after your contract ended -- that's

Page 43

when you had an issue with them using your name, image, and likeness; is that right?

A.    No.  I had a problem with them using my name before.  And I told them such.

Q.    When did you first tell them that you didn't want them to use your name, image, and likeness?

A.    I told Randy Kozuch and John Commerford who's now...

Q.    And when did you tell them that?

A.    When they took over.

Q.    When was that?

A.    I don't remember.

Q.    All right.  Did you tell anyone else at the NRA that you didn't want them to use your name, image, and likeness before Randy Kozuch took over?  Or was he the first --

A.    Yes.

Q.    Who?

A.    Harlon Carter.

Q.    When did you tell him that you didn't want them to use your name, image, and likeness?

A.    Years ago.

Q.    When?

A.    I don't remember.  What part of I don't remember don't you understand?

Page 44

Q.   Ms. Hammer, I'd like to direct your attention to page 16 of your Complaint, and paragraph 70 specifically.  In paragraph 70, it reads, "Plaintiff restates the allegation set forth in paragraphs 1 to 56 and 66 above as it's fully set forth herein."  Do you see that?

A.   I see that.

Q.   Okay.  And the paragraph that we read earlier --

A.   You know that I wrote this a long time ago.

Q.   The paragraph that we read earlier --

A.   Years ago.

Q.   The paragraph that we read earlier was paragraph 52; correct?

A.   I don't know.

Q.   If you could, turn back to paragraph 52.

A.   No.

Q.   Paragraph 52 is the paragraph that reads, "Since the NRA's breach of the contract on or about April 22nd, 2024, that NRA has continued to use Plaintiff's name, image, and likeness without Plaintiff's consent."

A.   I have never given them permission.  Period.

Q.   Okay.  And I understand what you're saying.  So with that, I do want to ask you some questions about the

Page 45

contract agreement.  So if you can look at Exhibit --

A.  I'm not answering any questions about the contract.

Q.  Well, you've got allegations in your Complaint about the contract.  So I'm going to ask you questions about the contract.  All right, Ms. Hammer?

A.  You can ask.  And I won't answer.

Q.  You're refusing to answer?

MR. COATES:  Ask the question.  We'll see what it is.

BY MR. HAYDEN:

Q.  All right.  Ms. Hammer, I'd like to direct your attention to Exhibit 2.  And in particular, if you could take a look at the first four pages of Exhibit 2.  On the top right-hand corner, you'll see, Ms. Hammer, where it says page 4 of 48.  And it goes all the way through page 48 of 48.

A.  Do you understand what the contract is?

Q.  So to make it --

A.  Do you understand?  I ask you.

Q.  Ms. Hammer, I'm here to answer your questions.  If you could just simply answer my questions --

A.  I will not answer your goddamn questions.

Q.  So I'd like to direct your attention to pages 4 of 48 through pages 7 of 48.  If you'd look at those,

Page 46

please.

A.   I will not.

MR. HAYDEN:  Counsel, we're not -- I can't ask questions if she's not going to look at the exhibit and answer them.

MR. COATES:  Which -- so this is Virginia.

MR. HAYDEN:  These are contracting agreements related to --

MR. COATES:  This is Case 125.

MR. HAYDEN:  That's -- it was -- this is just for purposes of navigating through the document. The contract --

MR. COATES:  We're not answering questions. Not in that case.  No.  Do you have -- what do you have?

MR. HAYDEN:  I'm not asking you questions about the Virginia case.  I'm asking you questions about our case, the contracting agreement, the history of the contracting agreement --

MR. COATES:  Are they identical?  I mean, where's the four --

MR. HAYDEN:  That's why I'm asking your client questions about it.  If she can look at these agreements and tell me --

MR. COATES:  Where's the ones from Florida on

Page 47

the Complaint?

MR. HAYDEN: We'll get to that. We're getting there.

MR. COATES: This -- who filed these?

MR. HAYDEN: Counsel, this is now my deposition.

MR. COATES: If you have the Florida case and the exhibit --

MR. HAYDEN: I do.

MR. COATES: Then let's --

MR. HAYDEN: And I have some questions about --

MR. COATES: Then we can discuss it.

MR. HAYDEN: I'm going to ask her questions about that. I'm also going to ask her questions about what led up to that agreement and her understanding of it and the alleged breach of it leading to the alleged --

MR. COATES: If you want to put -- if you put the Florida case in, then put it up here.

MR. HAYDEN: I'm going to ask her questions about these, unless she refuses to answer them.

MR. COATES: This is in Virginia.

MR. HAYDEN: No. We're here in Florida.

MR. COATES: I understand. But these are your -- this is -- this is all documents from

Page 48

Virginia.  What's in Florida?

MR. HAYDEN:  These are documents that I'm entering into our case as an exhibit in Ms. Hammer's deposition in the Florida case.

MR. COATES:  And her counsel for Virginia is not here on Count I.

MR. HAYDEN:  I'm not asking her questions about the Virginia case.

MR. COATES:  Then bring up -- put the Florida case in, Counsel.

MR. HAYDEN:  We can redact the top numbers, if you'd like, off this document.  It's the agreement itself that I'm going to ask questions about.

MR. COATES:  Is this --

MR. HAYDEN:  The header on it is merely for purposes of navigating through the documents so we know what page we're --

MR. COATES:  The only contract at issue in Florida was the last one.  Whatever is -- I don't know what's going on in Virginia, Counselor.  I'm not privy to it.  I'm not admitted --

MR. HAYDEN:  This has nothing to do with Virginia.

MR. COATES:  I don't know.  You're bringing a Virginia document.

Page 49

MR. HAYDEN:  I'm bringing a document --

MR. COATES:  In a stack that's not in Florida.

MR. HAYDEN:  -- to ask her about --

It is in Florida.  Because it's in this deposition.

THE WITNESS:  Your deposition -- you don't get to ask anything you want to.

MR. HAYDEN:  Ms. Hammer, I'm asking you questions about the background of the contract that you allege was breached that led to violations of your name, image, and likeness rights.  And so either you're going to answer the question or you're not.

THE WITNESS:  I'm going to tell you what I -- and you can figure out which questions.

BY MR. HAYDEN:

Q.   So I'd like to direct your attention to the first four pages of Exhibit 2 to your deposition.  Can you take a look at that, please.

A.   No.

MR. HAYDEN:  For the record, the witness is refusing to look at the document to answer any questions about it.  This is directly related to -- background related to the Complaint that's included -- allegations in her Complaint related to

Page 50

her name, image, and likeness claims.

BY MR. HAYDEN:

Q. And if you don't answer questions, I'm going to go to the Court. I'm going to move them to compel you to answer the questions and seek fees and costs. Do you understand that?

A. No. I don't understand. Because you were not speaking to me. And I don't understand. You're an ass.

Q. You said that several times. I think you made that pretty clear -- your feelings.

Will you take a look at pages -- the first four pages --

MR. COATES: Can we take a break. I'm going to call the Virginia counsel.

MR. HAYDEN: We'll go off the record.

THE VIDEOGRAPHER: The time now is 10:05 a.m. We're off the record.

(Brief recess.)

THE VIDEOGRAPHER: The time now is 10:16 a.m. We're back on the record.

BY MR. HAYDEN:

Q. Ms. Hammer, I'd like to direct your attention back to Exhibit 1 to your deposition, please -- your Verified Complaint.

A. This is 2. This is 1.

Page 51

MR. COATES:  Yes, ma'am.

BY MR. HAYDEN:

Q.   If you could, flip to paragraph 52, please.

All right.  So I know we read it before.  But for the sake of continuity and your understanding, it reads, "Since the NRA's breach of the contract on or about April 22nd, 2024, the NRA has continued to use Plaintiff's name, image, and likeness without Plaintiff's consent."  Do you see that?

A.   Yes.  I see that.

Q.   Can you tell me in what ways the NRA has continued to use your name, image, and likeness without your consent?

A.   Online.

Q.   When you say "online," what do you mean?

A.   Goddamn it.  You know what I mean.

Q.   I don't, Ms. Hammer.  Can you tell me what do you mean --

A.   Then pull up -- he has a computer.  And pull up -- it has my picture and my name.

Q.   Can you tell me what stands out to you as the single most egregious worst case use of your name, image, and likeness since the cancellation of your contract?  Can you --

A.   No.

Page 52

Q.   -- tell me what it was?

A.   I can't tell you.

Q.   Do you know a single use of your name, image, and likeness that occurred --

A.   All you have to do is go online.  And my picture and likeness and promoting the NRA and NRA programs is there.

Q.   So I understand that.  And this is my one chance to ask you questions about your knowledge right now.

A.   I just told you.

Q.   Yeah.  And so my question to you is:  Can you give -- as you sit here right now, do you know the --

A.   I just gave it to you.  So shut the hell up.

Q.   Do you know of a single example of the use of your name, image, and likeness that you can tell me as you sit here right now?

A.   I just told you.

Q.   If the answer is no, tell me no.

A.   I just told you.  I just told you.

Q.   And beyond what you've told me, do you know of a single instance where your name, image, or likeness has been used since the termination of your contract?

A.   It's constant.  Any time you go online, it's there.

Page 53

Q.   Beyond that, can you give me any more specificity?  Do you know of any single time --

A.   What specificity do you want?

Q.   For example, do you know was there a particular article or a time that your name --

A.   I told you.  All the time.  24 hours a day, if you go online and pull up my name and my picture.

Q.   I understand that.  And I'm asking you if you can give me a simple example --

A.   I just gave you an example.

Q.   I didn't hear.  What was the example?

A.   Every day.  Every hour of every day.  Right now.

Q.   Beyond that, can you give me any more specificity?

THE WITNESS:  Is he stupid or what?

BY MR. HAYDEN:

Q.   Ms. Hammer, you can't ask your counsel questions.

A.   I can do any goddamn thing I want to.

Q.   I know you believe that, but you can't.

Can you give me any more specificity?  And if the answer is no, that's fine.

A.   I gave you right now.

Q.   Have you told me everything you know as you sit

Page 54

here right now?

A.   No.  I haven't told you everything I know.

Q.   Then tell me what else do you know.  What other examples of the use of your name, image, and likeness have you not --

A.   I just told you.  Constantly.  It's there now as we sit here.

Q.   I'm asking:  Do you know of a single example?

THE WITNESS:  Is he stupid or what?

BY MR. HAYDEN:

Q.   Ms. Hammer, can you answer the question?

A.   I answered the question.

Q.   I ask that you stop yelling at me, please.

A.   Please.  You say please.

Q.   Are you able to do that?  Maybe answer questions without yelling?

A.   I can answer any goddamn question.  You don't seem to be listening.

Q.   Well, I'm trying to find out what you know.  You told me there's more information you know, but you're not telling me.  So I'm asking you again.  Can you give me an --

A.   I told you an example is right now.

Q.   Beyond that, do you have any other testimony about use of your name, image, and likeness?

Page 55

A.    It's been used since I -- Harlon Carter asked me in 1975 to be on the board.

MR. HAYDEN:   Ms. Hammer, I'm handing you what I marked as Exhibit 3 to your deposition.  It's titled "Marion P. Hammer Woman of Distinction Award."

(Defendant's Exhibit No. 3 was marked for identification.)

BY MR. HAYDEN:

Q.    Have you heard of that award before?

A.    Yes.  They created that.

Q.    And would you agree, Ms. Hammer, that as the first female president of the NRA and given your history of activism and leadership of the NRA that you are in some sense a historical figure when it comes to gun rights?  Would you agree with that?

A.    Yes.

Q.    And would you agree that as lobbyist for the Second Amendment and Second Amendment rights who has fought for things such as the right to carry and the castle doctrine and has even sometimes been threatened -- received death threats that your life and actions have at times been newsworthy?  Would you agree with that?

A.    I don't know.

Q.    Have news articles been written about you and

Page 56

your legacy?

A.   Yes.

Q.   So would you agree that what you've done on behalf of the Second Amendment rights -- that those have been newsworthy events?

A.   NRA made it newsworthy.

Q.   Okay.  And would you agree that it deserved to be in the news and people needed to know about it?

A.   No.

Q.   No, people didn't need to know about it?

A.   No.

Q.   Why were you fighting for those rights if you didn't want people to know about it?

A.   Because I wanted to protect people.  They already thought they had rights.

Q.   Okay.  And when you -- did you succeed in managing to protect people's Second Amendment gun rights?

A.   I did.

Q.   And did you think that people should know about that when you --

A.   No.  Because they had the rights from the beginning, and they didn't know.  People didn't know that they were threatened.

Q.   Okay.

Page 57

A.    And didn't know that I was...

Q.    So is it your testimony then that it doesn't matter if people know about their rights -- their Second Amendment gun rights?

A.    That's not my testimony.  You're trying to put words in my mouth.

Q.    Can you tell me, Ms. Hammer, when was the Marion P. Hammer Woman of Distinction Award first created?

A.    I don't remember.

Q.    Can you give me a general ballpark?  Or you have no idea when it was created?

A.    It was after I was president.

Q.    If you look at the third page of this document, Ms. Hammer -- the last page of the document, please.  Do you see at the top it says "Recipients of the Marion P. Hammer Woman of Distinction Award"?  Do you see where it says that?

A.    I see it.

Q.    And do you see it has various years listed down the left-hand side and names on the right?

A.    The Women's Policy Committee would select these people.  I didn't.

Q.    Okay.

A.    And I don't even know who they are.

Page 58

Q.   Now, it lists here in 2005 -- it looks as though four people won the award.  Do you see that?

A.   I saw it.

Q.   Was the award in existence as of 2005?

A.   It obviously was.

Q.   Okay.  Does that jog your memory as far as when the Marion P. Hammer Woman of Distinction Award was first created?

A.   No, it doesn't.

Q.   So clearly before 2005.  But you don't recall when; is that right?

A.   Correct.

Q.   Okay.  Can you tell me why the award was created, if you know?

A.   Because I'm a privileged person.

Q.   What do you mean by you're a privileged person?

A.   You don't know?

Q.   No.  I don't know.

A.   Then why am I sitting here?

Q.   What do you mean by you're a privileged person?

A.   I did great things for NRA at NRA's request.

Q.   Okay.  And is that --

A.   And NRA used my name and the woman of distinction award.

Q.   Okay.  And is that your understanding of why

Page 59

the award was created -- because you did great things for the NRA?

A.   Because what?

Q.   You did great things for the NRA, I believe, is what you just testified.

A.   Yes.

Q.   Okay.  And can you give me an example of a great thing that you did?

A.   If I have to give you an example, then you don't know.

Q.   You're right.  I don't know.  Can you tell me what's a great thing that you did for the NRA?

A.   Well, number one, I created the Eddie Eagle Program for children -- school children.

Q.   Okay.  What else did you do that you consider great?

A.   I was the first woman president.

Q.   Okay.  Anything else?

A.   Yes.  I defeated Neal Knox and his band of people who wanted to take over NRA and gut it of money and put it in their pockets and walk off.

Q.   Okay.

A.   Roman Coleman.

Q.   Okay.  Any other great things that you did for the NRA for which you believe you were given this

Page 60

award -- or the award was named for you?

THE WITNESS:  Am I going to have to put up with this crap?

MR. HAYDEN:  Ms. Hammer, if you can answer my questions, please.

THE WITNESS:  No.  I will not answer your question.

BY MR. HAYDEN:

Q.   Did you -- at the time this award was created, did you approve --

A.   No.

Q.   -- of the award?

Did you approve or consent that --

A.   They created it and told me that they had created it.

Q.   And did you agree to the creation of the award at the time?

A.   At the time, they told me they had created it. And I said okay.

Q.   Okay.  And did you consider it an honor that an award had been named after you?

A.   Yes.

Q.   Do you believe that the Second Amendment and the right to bear arms is a newsworthy topic?

A.   It's a Constitutional right.

Page 61

Q.    Yeah.  That's not my question.

Do you believe --

A.    I don't care what your question was.  You don't know what it's all about, obviously.

Q.    So my question, again, is:  Do you believe that the Second Amendment and the right to bear arms is a newsworthy topic?

A.    No.

Q.    All right.  Do you believe that the role of women in defending and promoting the Second Amendment and the right to bear arms is a newsworthy topic?

A.    I think women should have the -- know that they have the right.

Q.    Okay.  And to let women know that they have the right -- do you agree that it should be proclaimed or told about in the news?

A.    No.

Q.    So you don't think the right to bear arms should be spoken about in the news?

A.    No.

Q.    Okay.  Do you believe that talking about a woman's role in history is a newsworthy topic?

A.    What I believe is my business and not yours.

Q.    Well, for the purposes of this deposition lawsuit, we need to know.  Do you think talking about a

Page 62

woman's role in history is a newsworthy topic?

A.   I just answered that question.

Q.   No, you didn't.

A.   I did.

Q.   I'll ask it again.  Do you believe that talking about a woman's role in history is a newsworthy topic?

A.   I told you no.

Q.   Okay.  At any point in time did you tell or notify the NRA that you did not consent to the announcement of the Marion P. Hammer Woman of Distinction Award?

A.   No.

Q.   You never told the NRA that you didn't consent to the award?

A.   No.

Q.   Okay.

A.   They didn't ask.

Q.   So at any point after the termination of your consulting agreement with the NRA, did the NRA announce the Marion P. Hammer Woman of Distinction Award in a way that you thought was an unauthorized use of your name, image, or likeness?

A.   They have always used my name and my work without my permission.

Q.   So you think from the very beginning of the

Page 63

creation of the award that that use of your name in the Marion P. Hammer Distinction Award was without your authorization?

A.   Yes.

Q.   I thought --

A.   They didn't ask me.

Q.   I thought you said before that you were honored by the naming of the award after you.  Is that right?

A.   I was honored.  And I did not tell them they could use my name.

Q.   Okay.  That's what --

A.   But they didn't ask.  And you don't know what words mean that you use.

Q.   So timing-wise I want to know -- after your consulting agreement ended, did the NRA ever use your name, image, and likeness in connection with the Marion Hammer Woman of Distinction award that you belive was an unauthorized work of your NIL -- name, image, likeness?

A.   Once they canceled my contract, they had no right to use my name.  Period.  For anything.

Q.   Are you aware of them doing that --

A.   Yes.

Q.   -- in connection with this Woman of Distinction Award?

A.   Yes.

Page 64

Q.    When did that happen?

A.    It's happening right now.  Go online.

THE WITNESS:  You know, this guy is an ass.
And I'm not...

BY MR. HAYDEN:

Q.    Can you recall a specific time that it was used
after the cancelation of your --

A.    It's never been unused.

Q.    How do you know that?

A.    How do I know that?  Because any time you go
online and you put my name in, it brings up NRA.

Q.    When is the last time that you did that?

A.    I don't recall.

THE WITNESS:  I'm not sitting here and
answering his stupid questions.

MR. HAYDEN:  I'm handing you what I've marked
as Exhibit 4 to your deposition, Ms. Hammer.

(Defendant's Exhibit No. 4 was marked for
identification.)

BY MR. HAYDEN:

Q.    Well, first off, let me ask you about Exhibit
3.  Do you believe that Exhibit 3 is an unauthorized use
of your name, image, and likeness?

A.    Yes.

Q.    Can you tell me why?

Page 65

A.   Because they didn't ask me.  They just didn't.

Q.   Any other reasons you think this is an unauthorized use of your name, image, and likeness?

A.   What more do you want?  You're stupid.

Q.   Any other reasons why you think this an unauthorized use of your name, image, and likeness?

A.   Are you stupid or just an idiot?

Q.   So I'll ask you one more time.  You can --

A.   I told you.

Q.   If you know any.  Or you can tell me you don't have any additional reasons.  Is that the case?

A.   No.  I told you it's unauthorized.  They have never asked me.  And it's ongoing constantly.

Q.   Can you look at the top of Exhibit 3, Ms. Hammer.  Exhibit 3, please.

At the top, it reads, "Marion P. Hammer has influenced many in her fight to preserve Second Amendment freedoms in her role as lobbyist in the passage of Florida's right to carry legislation through her grassroots efforts in educating youth about firearms safety.  Ms. Hammer exemplifies activism and leadership."  Do you see that?

A.   I see it.

Q.   Would you agree with me that this includes historically accurate information -- that what I just

Page 66

read is historically accurate?

A.   Yes.

Q.   Okay.

A.   But they didn't ask me about anything.  They didn't ask me to use my name.  They didn't ask me anything.

Q.   Do you believe that Exhibit 3 serves any commercial purpose or benefits the NRA financially in any way?

A.   Yes.  It does.

Q.   Can you tell me how?

A.   Because without me, they wouldn't have anybody to promote.

Q.   Can you tell me how it benefits the NRA financially, if you know?

A.   Because they use my name and image to gain membership.

Q.   Okay.  Does --

A.   And donations.

Q.   Does it benefit them financially in any other way besides donations and membership?

A.   I don't know.

Q.   Okay.  And besides what you just stated, is there any other commercial purpose that you believe that this Exhibit 3 serves?

A.    I don't know.

Q.    Is anything being sold or advertised by Exhibit 3 in your opinion?

A.    Yes.  Everything.

Q.    What's being advertised or sold?

A.    It's being advertised that it's a great organization and I'm a member and I work for the organization.

Q.    Is anything else being sold or advertised in your opinion?

A.    You're just an idiot.

Q.    You stated that on the record several times.

But I'm asking you:  Is anything aside from what you told me being sold or advertised by this Exhibit 3?

A.    I don't know.

Q.    Okay.  Can you tell me -- do you think you've been harmed in any way by --

A.    Yes.

Q.    -- Exhibit 3?

Can you tell me how you think you've been harmed?

A.    Because they've used my name and haven't paid me.  They made a bunch of money using my name and haven't paid me a dime.

Page 68

Q.   Have you been harmed in any other way?

A.   Financially.

Q.   Aside from what you stated, have you been harmed in any other way?

A.   I don't know.

Q.   Okay.

A.   If you don't have intelligent questions to ask, I'm leaving.  I'm going to puke on you.  I'm trying to drink water to keep from puking.

Q.   Okay.  So you said that one of the ways you believe you've been harmed is the NRA has made money and not paid you; is that right?

A.   Yes.

Q.   Okay.  Can you tell me how much has the NRA received financially from --

A.   Millions.

Q.   -- Exhibit 3?

A.   Millions.

Q.   How do you know that?

A.   I guess.

Q.   Okay.  Can you name a single person who donated money to the NRA because of Exhibit 3, this online nomination form?

A.   I did.

Q.   You did?

Page 69

A.   I did.

Q.   Okay.  Can you name anyone else aside from you who has donated money to the NRA because of Exhibit 3, the online nomination --

A.   I don't know.

Q.   And I guess since you say you don't know -- do you know how much they donated?

A.   If I don't know, I don't know.  What part of I don't know don't you understand?

Q.   Can you name a single person who joined the NRA as a member because of this Exhibit 3, the online nomination form?

A.   Yes.

Q.   Who?

A.   I won't tell you.

Q.   Do you know -- can you name a single person who joined the NRA because of this online nomination form since 2024?

A.   I don't know.  I don't know who all are members or why they're members.

Q.   So, Ms. Hammer, I'm going to ask you similar questions about Exhibit 4 to your deposition.  If you can look at that.

Up at the top of this document -- I know it's pretty light.  But it appears to read, "Marion

Page 70

P.   Hammer has influenced many in her fight to preserve Second Amendment freedoms.  From her role as lobbyist in the passage of Florida's right to carry legislation to her grassroots efforts in educating youth about firearm safety, Ms. Hammer exemplifies activism and leadership."  Do you see that?

A.   No.  I don't see that.

Q.   Up at the top there.

A.   No.  Not on 4.

Q.   You're not able to read that?  And if not, that's fine.

A.   No.  I can't read it.

Q.   Okay.  I'll represent to you that's what that says.  If that's what it says, will you agree with me that those are historically accurate facts?

A.   I don't know that they're facts.  NRA created it without my permission without my knowledge.

Q.   So do you think it's -- it says you have influenced many people in your fight to preserve Second Amendment freedoms.  Is that false?

A.   I don't know.  NRA says that, and I don't know.

Q.   It says that in your role -- it says, "From her role as lobbyist in the passage of Florida's right to carry legislation to her grassroots efforts in educating youth about firearm safety, Ms. Hammer exemplifies

Page 71

activism and leadership."  Do you believe that that's false?

A.   I don't know.

Q.   Okay.  Do you believe that this document -- Exhibit No. 4, which you're looking at -- serves any commercial purpose or benefits the NRA in any way?

A.   I don't know.

Q.   Okay.  Do you know if the NRA has ever sent this document -- Exhibit No. 4 -- to anybody since the termination of your consulting agreement?

A.   I don't know.

Q.   Do you think you've been harmed in any way by this Exhibit 4?

A.   Yes.

Q.   Can you tell me how?

A.   No.

Q.   You don't know how you've been harmed?

A.   I won't tell you how I've been harmed.

Q.   Well, it is my once chance to ask you.  You're claiming damages --

A.   You can ask until hell freezes over.  And I'm not going to answer you.

Q.   You're refusing to answer that question -- how you think this document has harmed you?

A.   I don't know.

Page 72

Q.   Okay.  Do you know if the NRA has received any financial benefit from this Exhibit 4?

A.   Yes.

Q.   What financial benefit?

A.   I don't know.

Q.   Why do you say they received a financial benefit if you don't know?

A.   Because I'm not stupid like you.

Q.   Any other reason?

A.   What?

Q.   Any other reason you believe that they received a financial benefit from this --

A.   They -- they don't do anything that they don't make money from.

Q.   Okay.  Do you have any -- are you aware of any other facts to show that they received a financial benefit from Exhibit No. 4?

A.   Ask your question again.

Q.   Yeah.  Do you know if the NRA has received any financial benefit --

A.   Yes.

Q.   What financial benefit?

A.   Membership and donations.

Q.   Okay.  Do you know -- can you name a single person who has donated money to the NRA because of this

Page 73

Exhibit No. 4?

A.   Yes.

Q.   Who?

A.   I won't tell you.

Q.   You have to tell me.  That's --

A.   I don't have to do anything.

Q.   Can you name a single person who has donated money?

A.   Yes.

Q.   Who?

A.   Apryl Marie Fogel.

Q.   When did she --

A.   Lisa Supernaugh.

Q.   Apryl Fogel.  Who was the other person?  Lisa Supernaugh?

A.   I said it.  And you couldn't get it.

Q.   Yes.  So I'm asking you again.  What is the last name?  Supernaugh?  Ms. Hammer?

          MR. COATES:  Just tell him.

BY MR. HAYDEN:

Q.   Ms. Hammer, can you answer the question?  You said --

A.   No.  I will not answer the question.  I'm going.  You're an asshole.

Q.   Are you leaving?

Page 74

A.   I'm leaving.

Q.   I'm telling you if you leave, we're going to ask the Court to compel you to come back.  And we're going to seek fees and costs.  Do you understand that?

A.   I understand that you are going to ask the Court to answer questions you already know the answers to.

Q.   So I'll ask you again -- who else do you know donated money to the NRA because of Exhibit 4?

A.   Apryl Marie Fogel and Lisa Supernaugh.

Q.   Anybody else?

A.   I don't know specifically.  But I did.

Q.   Okay.  Aside you, Apryl, and Lisa Supernaugh, do you know of anybody else who donated money to NRA because of Exhibit 4?

A.   No.  I don't know.

Q.   When did Apryl Fogel donate money to the NRA because of Exhibit 4?

A.   She gave money to the foundation.  And NRA cancelled the checks.

Q.   And when was that?

A.   Couple years ago.

Q.   Before 2004 or after?

A.   I don't remember.

Q.   Okay.  Do you know how much she donated?

Page 75

A.   Five grand.

Q.   Okay.  What about --

A.   In three checks.

Q.   What about Lisa Supernaugh?

A.   I don't know.

Q.   Do you know when she donated money --

A.   No, I don't.  I just assume she did.

Q.   Okay.  And do you know how much she donated?

A.   No.

Q.   Can you name a single person who joined the NRA or became a member of the NRA because of Exhibit 4 to your deposition?

A.   Yes.

Q.   Who?

A.   I don't want to tell you.

Q.   Do you know a single person who joined the NRA?

A.   Yes.

Q.   Who?

A.   I won't tell you.

Q.   Do you understand that you're required to answer my questions?

A.   I understand that your questions are stupid. And any judge who thinks that I have to answer your stupid questions is stupid too.

Q.   So, Ms. Hammer -- are you leaving, Ms. Hammer?

Page 76

A.   I'm not leaving.  But you need to...

Q.   I'll ask you again.  Who joined the NRA or placed membership with the NRA because of Exhibit 4 to your deposition?

A.   I'm not telling you.

Q.   You understand I'm going to ask the Court to compel you to answer the question.  And I --

A.   I don't know.

Q.   Okay.

A.   And you think you're a big deal.  And you're not.

THE WITNESS:  Look at the pile of crap he's got.  I'm not going to sit here all day.

MR. COATES:  Understood.

MR. HAYDEN:  Ms. Hammer, I'm handing you what's been marked as Exhibit 5 to your deposition.

(Defendant's Exhibit No. 5 was marked for identification.)

BY MR. HAYDEN:

Q.   Have you seen this Facebook post before?

A.   What's your question?

Q.   Have you seen this post before -- this Facebook post?

A.   I have.

Q.   Okay.  And at the top, it says, "1995 Marion

Page 77

P.   Hammer became NRA's first woman president.  Watch the video and learn why she's still known as one of the most ardent and effective defenders of the Second Amendment in the --"

A.   I have not watched the video.

Q.   Do you disagree with the accuracy of any of those statements I just read?

A.   It's true that in 1995 I became NRA's first woman president.

Q.   So that's historically accurate information; correct?

A.   Yes.

Q.   Do you believe that this Facebook post serves any commercial purpose or benefits the NRA financially in any way?

A.   Yes.

Q.   Can you tell me how?

A.   Because they publish it and send it out to encourage women to join.

Q.   Okay.  Does it benefit them financially in any other way?

A.   I don't know.  You're stupid.

Q.   Can you tell me what's being sold or advertised by this Facebook post?

A.   You're stupid.

Page 78

Q.   Is that your answer?

A.   What's being sold or advertised?

Q.   If anything by this Facebook post?

A.   Women and guns.

Q.   Anything else?

A.   What do you want?

Q.   I want to know your opinion -- if you think that anything else is being sold or advertised by this post aside from women and guns.

A.   They're advertising me as the primary woman and guns.

Q.   Okay.  Beyond your testimony so far, is there anything else that you believe this Facebook post is selling or advertising?  Ms. Hammer, is there anything in addition?  And, if not, that's fine.  I want to know what you know.

A.   I don't know.

Q.   Okay.  Do you know how many people have viewed this Facebook post?

A.   No.  I don't know.

Q.   And I believe you stated --

A.   Do you know?  Do you know?  Do you know?

Q.   I'm not here to answer your questions --

A.   Yes, you are.  You're here to answer my questions just like I'm here to answer yours.

Q.   So I believe you stated that one of the ways you belive the NRA benefits financially from this Facebook post is that women place membership with NRA. Did I understand your testimony correctly?

A.   Yes.

Q.   Okay.  Do you know -- well, before I get to that, let me ask you:  Do you think you've been harmed in any way by this Facebook post?

A.   I haven't been harmed.  But I haven't been paid.

Q.   Okay.  No harm you're saying?  You have not been harmed by this post; correct?

A.   Financially I've been harmed.  Because they haven't paid me.

Q.   Okay.

A.   And they used my name without telling me.

Q.   Do you know --

A.   And without my permission.

Q.   Do you know if the NRA has received any financial benefit from this Facebook post?

A.   I would assume so.

Q.   Beyond your assumption, do you know?  Or are you just guessing?

(Brief interruption.)

MR. HAYDEN:  For the record -- well, I mean,

Page 80

it's on video.

Ms. Hammer, that's the second time you tried -- you tried to throw hot coffee at me before.

THE WITNESS:  I did not attempt to throw hot coffee at you.

MR. HAYDEN:  And now you've thrown --

THE WITNESS:  I haven't had any.

MR. HAYDEN:  And now you've thrown water at me.

Let's go ahead and take a break.  But I -- I'm at the point where I think I might seek sanctions against you, Ms. Hammer.  Your behavior today has been entirely inappropriate.  Your --

THE WITNESS:  You are an asshole.

MR. HAYDEN:  Your tone has been inappropriate. I think we're going to need to ask the Court --

THE WITNESS:  You think you're God.  And I think you're an asshole.

THE VIDEOGRAPHER:  Ready to go off the record?

The time now is 10:55 a.m.  We're off the record.

(Brief recess.)

THE VIDEOGRAPHER:  The time now is 11:02 a.m. We're back on the record.

MR. HAYDEN:  So going back on the record.  Just before we went on break, Ms. Hammer threw a glass of

Page 81

water at me.  She's been rude the entire deposition -- yelling, screaming, yelling various profanities.  She earlier tried to throw my coffee cup at me.  So we're ending the deposition result of the latest actions; which I think amount to actual assault.  So we're going to seek appropriate relief from the Court.

We're ending the deposition for today.  I don't think it can go on.  And I don't trust that Ms. Hammer is going to behave or not attempt to throw anything else at me during the deposition.  So we're ending it for today.  Thank you.

THE WITNESS:  He's a lying asshole.

MR. COATES:  We're off the record.

THE VIDEOGRAPHER:  The time now is 11:03 a.m. We're off the record.

(This deposition was suspended at 11:03 a.m.)

_ _ _

Page 82

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF LEON


     I, GREG T. SMITH, Stenographic Shorthand Reporter and Notary Public, State of Florida, certify that MARION HAMMER appeared before me on March 17, 2026, and was duly sworn and produced her driver's license as identification.

     Signed this 17TH day of MARCH, 2026.




                    GREG T. SMITH

                    Notary Public, State of Florida
                    My Commission No.: HH 490141
                    Expires:  March 21, 2028

Page 83

CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF LEON:

    I, GREG T. SMITH, Notary Public, State of Florida,

certify that I was authorized to and did

stenographically report the deposition of MARION HAMMER;

and that the foregoing transcript, pages 4 through 81,

is a true and accurate record of my stenographic notes.

    I further certify that I am not a relative,

employee, or attorney, or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorneys or counsel connected with the action, nor am I

financially interested in the action.


    DATED this 17TH day of MARCH, 2026.


                    GREG T. SMITH

**[00219 - 87]**

**0**

**00219**  1:3 4:8

**1**

**1**  2:3 3:9 35:11 35:12 37:11,12 41:17 44:4 50:23,25
**101**  1:14
**10:05**  50:16
**10:16**  50:19
**10:55**  80:19
**115**  2:3
**11790**  2:12
**11:02**  80:22
**11:03**  1:12 81:15,17
**125**  46:9
**13**  41:19
**1507**  10:2,11
**16**  44:2
**17**  1:11 82:7
**1746**  37:22
**17th**  4:4 82:10 83:16
**19**  27:8
**1939**  9:21
**1956**  12:24
**1970s**  20:16
**1975**  18:22 25:9,10 27:2 28:2 32:9 55:2
**1976**  32:10,11 32:12

**1982**  27:8
**1995**  32:2,7,11 76:25 77:8
**1998**  32:2

**2**

**2**  3:10 36:14,15 37:8 38:18 45:13,14 49:18 50:25
**20**  18:5
**2004**  74:23
**2005**  58:1,4,10
**2017**  16:22,23
**20191**  2:13
**2024**  25:24 27:2,8 28:2 41:24 44:20 51:7 69:18
**2025**  37:25 38:5
**2026**  1:11 4:4 82:7,10 83:16
**2028**  82:17
**208**  2:4
**21**  82:17
**22**  37:16,21
**22779**  82:15 83:19
**22nd**  41:24 44:20 51:7
**24**  53:6
**248-9038**  2:4

**26th**  9:21
**28**  37:22

**3**

**3**  3:11 55:4,6 64:22,22 65:14 65:15 66:7,25 67:3,15,20 68:17,22 69:3 69:11
**32202**  2:8
**32301**  1:15 2:4
**35**  3:9
**36**  3:10

**4**

**4**  3:12 45:16,24 64:17,18 69:22 70:9 71:5,9,13 72:2,17 73:1 74:9,15,18 75:11 76:3 83:8
**400**  2:12
**48**  45:16,17,17 45:25,25
**483-8300**  2:13
**483-8301**  2:13
**490141**  82:17
**4:25**  1:3 4:8

**5**

**5**  3:3,14 76:16 76:17

**501**  2:7
**50s**  20:12
**52**  41:18,19,22 44:14,16,18 51:3
**55**  3:11
**56**  44:4

**6**

**6**  37:24
**60s**  20:12
**638-2655**  2:9
**638-2656**  2:9
**64**  3:13
**66**  44:5
**681-1029**  2:4
**6th**  38:3

**7**

**7**  45:25
**7/10/23**  3:14
**70**  44:2,3
**703**  2:13,13
**70s**  20:13,15 22:3
**76**  3:14

**8**

**800**  1:14
**81**  83:8
**82**  3:4
**83**  3:5
**850**  2:4
**87**  15:25 16:13 21:16 33:19

**[8:58 - answering]**

| | | | |
|---|---|---|---|
| **8:58** 1:12 4:3 | **accurately** 8:7 8:12 | **affirm** 5:9 | 60:23 61:6,10 65:18 70:2,20 77:4 |
| **9** | **achievement** 33:7 | **ago** 25:23 43:22 44:10,12 74:22 | **america** 1:7 4:7 4:23 5:22 |
| **902** 2:8 | **achievements** 33:11 | **agree** 6:23 7:23 32:23 33:1,22 34:2,7 55:11 55:15,17,22 56:3,7 60:16 61:15 65:24 70:14 | **amount** 81:5 |
| **904** 2:9,9 | **action** 4:14 18:21 83:13,14 | | **ann** 12:9 |
| **9:06** 11:6 | | | **announce** 62:19 |
| **9:07** 11:9 | **actions** 55:22 81:5 | | **announcement** 62:10 |
| **9:25** 24:12 | **activism** 55:13 65:21 70:5 71:1 | **agreement** 39:1 45:1 46:18,19 47:15 48:12 62:19 63:15 71:10 | **answer** 6:17,24 6:25 7:8 9:2 10:23 20:4 21:9,11 23:18 24:3,5,23 39:4 40:6,11,12,19 41:2 45:7,8,21 45:22,23 46:5 47:21 49:12,22 50:3,5 52:19 53:23 54:11,15 54:17 60:4,6 71:22,23 73:21 73:23 74:6 75:21,23 76:7 78:1,23,24,25 |
| **9:29** 24:15 | | | |
| **9:50** 41:10 | | | |
| **9:55** 41:13 | **actual** 81:5 | | |
| **a** | **addition** 78:15 | | |
| **a.m.** 1:12,12 4:3 11:6,9 24:12,15 41:10 41:13 50:16,19 80:19,22 81:15 81:17 | **additional** 65:11 | **agreements** 38:22 46:7,24 | |
| | **address** 11:17 18:2 | **ahead** 80:9 | |
| | **administer** 4:12 | **alberta** 6:3 | |
| | | **alcohol** 8:3,9 | |
| **ability** 8:6,11 | **admitted** 48:21 | **allegation** 44:4 | |
| **able** 21:18 24:24 31:18 54:15 70:10 | **adult** 16:16,19 | **allegations** 37:2 38:25 45:4 49:25 | |
| | **advertised** 67:2 67:5,6,9,14 77:23 78:2,8 | | |
| **above** 38:9 44:5 | | **allege** 49:10 | **answered** 36:7 54:12 62:2 |
| **absolutely** 34:3 | | **alleged** 47:16 47:17 | |
| **account** 17:13 17:14,15,19 | **advertising** 78:10,14 | **allow** 6:23,25 7:17 9:1,16 24:23 41:1 | **answering** 8:23 10:25 11:14 37:5 38:20,23 40:18,21 45:2 46:13 64:15 |
| | **affiliate** 19:21 | | |
| **accuracy** 77:6 | **affiliation** 22:18,23 23:2 | | |
| **accurate** 18:5 27:2 29:5 65:25 66:1 70:15 77:10 83:9 | | **amendment** 55:18,18 56:4 56:17 57:4 | |
| | **affiliations** 4:17 | | |

**[answers - believe]**

**answers** 74:6
**anybody** 19:11
  66:12 71:9
  74:11,14
**anymore** 25:15
**aol.com.** 17:24
**apart** 16:10,20
**apologize** 17:10
**appearance**
  4:20
**appearances**
  4:17
**appeared** 82:7
**appearing** 2:5
  2:10,14
**appears** 69:25
**appropriate**
  81:6
**approve** 60:10
  60:13
**approximately**
  25:6 27:1,24
  31:25
**april** 9:21
  41:24 44:20
  51:7
**apryl** 73:11,14
  74:10,13,17
**ardent** 77:3
**armed** 14:4
**arms** 18:11
  20:2 26:8
  60:24 61:6,11
  61:18

**arrived** 30:25
**arthur** 11:22
**article** 53:5
**articles** 55:25
**aside** 8:17
  13:20,24 14:17
  16:14 67:13
  68:3 69:2
  74:13 78:9
**asked** 18:23
  20:5 27:14
  42:13 55:1
  65:13
**asking** 19:9
  21:9 22:24,24
  31:6,14 39:18
  46:16,17,22
  48:7 49:8 53:8
  54:8,21 67:13
  73:17
**ass** 23:14 50:8
  64:3
**assault** 81:6
**asshole** 13:18
  17:4 73:24
  80:13,17 81:13
**assholes** 17:8
**associate's** 13:8
  13:10,11
**association** 1:7
  4:6,23 5:22
**assume** 75:7
  79:21

**assuming** 29:4
**assumption**
  79:22
**atlanta** 12:24
**attach** 5:4
**attempt** 80:4
  81:10
**attention** 13:23
  41:16 44:1
  45:13,24 49:17
  50:22
**attorney** 4:20
  5:21 8:17 15:1
  17:8 35:19
  83:11
**attorneys** 83:13
**authorization**
  63:3
**authorized**
  4:12 83:6
**avenue** 2:3,7
**avondale** 10:2
  10:11
**aw** 1:3 4:8
**award** 3:13
  55:5,9 57:8,17
  58:2,4,7,13,24
  59:1 60:1,1,9
  60:12,16,21
  62:11,14,20
  63:1,2,8,17,24
**awards** 34:23
**aware** 63:21
  72:15

**b**

**bachelor's** 13:6
  13:8
**back** 11:10,18
  13:5 16:23
  20:12 21:13
  24:16 37:9
  41:14,17 44:16
  50:20,23 74:3
  80:23,24
**background**
  12:22 24:19
  49:9,24
**ballpark** 57:11
**band** 59:19
**bank** 10:7
**bankruptcy**
  15:16
**bear** 18:11 20:2
  26:7 60:24
  61:6,11,18
**beginning** 4:20
  30:14 56:23
  62:25
**begins** 4:4
**behalf** 2:5,10
  2:14 4:22 5:1
  19:16 35:20
  56:4
**behave** 81:10
**behavior** 80:11
**believe** 32:5
  35:23 53:21

59:4,25 60:23 61:2,5,9,21,23 62:5 64:22 66:7,24 68:11 71:1,4 72:11 77:13 78:13,21 79:1

**belive** 63:17 79:2

**bell** 14:24 29:16

**benefit** 5:5 66:20 72:2,4,7 72:12,17,20,22 77:20 79:20

**benefits** 66:8 66:14 71:6 77:14 79:2

**best** 6:25 24:21 24:24 32:13 36:1,4

**better** 39:24

**beyond** 13:11 52:21 53:1,14 54:24 78:12 79:22

**big** 16:1 17:9 23:20 76:10

**bill** 18:23

**birth** 9:19

**bit** 16:4 18:8 26:3 36:10

**blaz** 17:8 23:19 28:16

**board** 27:5,13 27:14,18 55:2

**born** 9:23

**bottom** 37:19 38:8

**breach** 41:23 42:5 44:19 47:16 51:6

**breached** 49:10

**break** 7:11,16 7:18 11:1 41:7 41:8 50:13 80:9,25

**breaks** 7:12,20

**brian** 2:6 4:22 5:20

**brian.hayden** 2:9

**brief** 11:8 23:11 24:14 41:12 50:18 79:24 80:21

**briefly** 5:19

**bring** 33:11 48:9

**bringing** 48:24 49:1

**brings** 64:11

**brought** 23:22

**bs** 21:25

**bull** 23:13

**bullshit** 21:7

**bunch** 17:7 67:24

**business** 13:4 20:5 61:23

**butt** 21:14

**c**

**c** 2:1 4:1

**california** 15:2

**call** 50:14

**called** 18:22 25:9,13,13,16

**camp** 32:8

**cancelation** 64:7

**canceled** 63:19

**cancellation** 51:23

**cancelled** 74:20

**capacity** 16:15

**care** 12:6,13 61:3

**carelessly** 30:8

**carolina** 9:23

**carry** 55:19 65:19 70:3,24

**carter** 18:22 19:20 20:5,7,8 20:25 25:9 27:14 31:13 43:19 55:1

**case** 1:3 4:7 15:1 46:9,14 46:17,18 47:7 47:19 48:3,4,8 48:10 51:22

65:11

**castle** 55:20

**cause** 5:10

**cavalier** 10:12

**ceo** 20:8,10

**certain** 33:25 34:7

**certificate** 3:4,5 82:1 83:1

**certify** 82:6 83:6,10

**chance** 52:9 71:19

**charges** 14:14

**charles** 10:12

**checks** 74:20 75:3

**child** 30:9

**children** 11:25 12:1,11 30:7 59:14,14

**chill** 23:12

**chris** 2:17 4:9

**claim** 42:6,15

**claiming** 71:20

**claims** 37:3 50:1

**clarification** 25:2

**clarify** 14:25

**clear** 6:20 50:10

**clearly** 58:10

**[client - court]** Page 5

client 46:22
clifford 11:22
coates 2:2,2 5:1
  5:1 9:5,8 11:1
  11:19 13:16
  14:25 15:14
  17:5,22 20:13
  21:8,11,15
  23:12,15 24:9
  36:10,18,21,23
  38:4,10 39:10
  39:20 40:2,20
  40:23 41:6
  45:9 46:6,9,13
  46:20,25 47:4
  47:7,10,12,18
  47:22,24 48:5
  48:9,14,18,24
  49:2 50:13
  51:1 73:19
  76:14 81:14
coffee 80:3,5
  81:3
coleman 59:23
colleen 12:3
college 16:11
  16:12
columbia 9:23
come 11:18
  74:3
comes 55:14
commercial
  66:8,24 71:6
  77:14

commerford
  43:7
commission
  15:9 82:17
committed
  14:13
committee
  27:21,25 28:3
  28:6,8 34:17
  34:19 57:22
committees
  27:17,20
compel 50:4
  74:3 76:7
compensated
  30:17,19
complaint 3:9
  15:8,11 35:16
  37:2,13,17
  38:14,25 41:18
  44:2 45:4 47:1
  49:24,25 50:24
composite 3:10
  38:19
computer
  51:19
connected
  83:13
connection
  63:16,23
consent 42:1,7
  42:11 44:22
  51:9,13 60:13
  62:9,13

consider 59:15
  60:20
consisting
  38:21
constant 52:24
constantly 54:6
  65:13
constitutional
  60:25
consulting
  62:19 63:15
  71:10
continue 23:15
  23:16 24:2
  34:15 41:4
continued
  41:24 42:15
  44:20 51:7,12
continuity 51:5
contract 36:19
  37:2 38:23
  39:1 41:23
  42:6,10,17,19
  42:21,23,25
  44:19 45:1,3,5
  45:6,18 46:12
  48:18 49:9
  51:6,24 52:23
  63:19
contracting
  3:10 38:21
  46:7,18,19
conversations
  33:23

convicted 14:7
  14:12
corner 45:15
correct 16:21
  25:5 32:22
  34:5 37:25,25
  38:14 42:9
  44:14 58:12
  77:11 79:12
correctly 79:4
costs 39:18
  40:8 50:5 74:4
council 28:12
  28:14,20,23
  29:2,3
counsel 4:16
  9:4 17:21
  36:23 39:25
  46:3 47:5 48:5
  48:10 50:14
  53:18 83:11,13
counseling 40:2
counselor
  48:20
count 36:23
  48:6
county 82:3
  83:3
couple 6:13
  25:23 74:22
course 10:5
court 1:1 4:10
  4:21 5:5,7,13
  6:15 7:4 11:17

24:3,3 35:6,8
35:20 39:17
40:7 50:4 74:3
74:6 76:6
80:15 81:7
**crap** 23:14 60:3
76:12
**create** 30:13
31:16
**created** 19:20
30:4,14 31:15
55:10 57:9,12
58:8,14 59:1
59:13 60:9,14
60:15,18 70:16
**creating** 6:22
30:17
**creation** 60:16
63:1
**crime** 14:7,12
14:13
**criminal** 14:14
**cs7904026** 1:25
**cup** 81:4
**currently** 9:25
13:20 14:14
**cv** 1:3 4:8
**cyber** 15:1

**d**

**d** 3:1 4:1
**damages** 37:13
71:20

**damn** 22:19
23:20
**danny** 10:13
**date** 1:11 9:19
38:2
**dated** 3:14
37:24 83:16
**daughter** 12:5
**day** 33:3 53:6
53:12,12 76:13
82:10 83:16
**deal** 16:1 17:9
23:20 76:10
**death** 14:9
55:21
**deceased** 12:5
12:10
**decides** 28:16
**defeated** 59:19
**defendant** 1:8
2:10,14 4:23
5:21,24
**defendant's** 3:8
35:12 36:15
55:6 64:18
76:17
**defenders** 77:3
**defending** 37:4
61:10
**degree** 12:23
12:25 13:2,3,5
13:6,8,11
**degrees** 13:12

**demand** 37:13
**deposition** 1:10
4:5 5:20 6:13
6:22 8:15,20
9:13 16:8
17:18 23:24
35:11 36:14
38:18 39:17
40:8 41:1,17
47:6 48:4 49:5
49:6,18 50:23
55:4 61:24
64:17 69:22
75:12 76:4,16
81:2,4,8,11,17
83:7
**deserved** 56:7
**diary** 16:24
17:2
**died** 32:7,8
**different** 6:5,7
22:11 23:5
26:22 39:22
**dime** 67:25
**direct** 3:3 5:17
41:16 44:1
45:12,24 49:17
50:22
**direction** 22:9
**directly** 49:23
**director** 20:6
20:22,23 25:20
27:12

**directors** 27:5
27:18
**disabled** 12:19
**disagree** 77:6
**discuss** 47:12
**distinction** 3:11
3:12 55:5 57:8
57:17 58:7,24
62:11,20 63:2
63:17,23
**district** 1:1,1
**division** 1:2
**doctrine** 55:20
**document**
46:11 48:12,25
49:1,22 57:14
57:15 69:24
71:4,9,24
**documents**
3:10 9:10 26:2
47:25 48:2,16
**dog** 10:12
**doing** 24:20
63:21
**donate** 74:17
**donated** 68:21
69:3,7 72:25
73:7 74:9,14
74:25 75:6,8
**donations**
66:19,21 72:23
**drafted** 35:14
**drink** 8:8 68:9

**[drive - figure]**

**drive** 2:12
**driver's** 13:21
  13:24 82:8
**drugs** 8:3,8
**duly** 5:15 82:8
**duties** 26:5,19
  32:16,18

**e**

**e** 2:1,1,2 3:1 4:1
  4:1
**eagle** 30:18,22
  31:2,12 59:13
**eagle's** 30:2
**earlier** 44:9,11
  44:13 81:3
**easier** 7:5,6
**east** 2:3
**eddie** 30:2,18
  30:22 31:2,12
  59:13
**educating**
  65:20 70:4,24
**education**
  13:14
**educational**
  12:22
**effective** 77:3
**efforts** 65:20
  70:4,24
**egregious**
  51:22
**either** 49:12

**elected** 32:10
**email** 17:12,14
  17:15,19 18:2
**employee** 22:8
  83:11,12
**encourage**
  77:19
**ended** 34:12,13
  34:14 42:17,19
  42:21,25 63:15
**entering** 48:3
**entire** 81:1
**entirely** 80:12
**entitled** 23:23
  23:25
**entity** 14:18
  16:12 19:18
**er** 21:25
**eric** 12:15
**esquire** 2:2,6
  2:11
**ethics** 15:8,9
  27:21,25 28:3
  28:6
**event** 32:24
  33:2,7
**events** 16:24
  33:23 56:5
**evp** 20:18
**examination**
  3:3 5:17
**examined** 5:15
**example** 52:15
  53:4,9,10,11

54:8,23 59:7,9
**examples** 54:4
**except** 22:21
**executive** 20:6
  20:21,23 25:20
  28:11,14,20,23
  29:2,3
**exemplifies**
  65:21 70:5,25
**exhibit** 3:9,10
  3:11,12,14
  35:4,11,12
  36:14,15 37:8
  37:11,12 38:18
  41:17 45:1,13
  45:14 46:4
  47:8 48:3
  49:18 50:23
  55:4,6 64:17
  64:18,21,22
  65:14,15 66:7
  66:25 67:2,15
  67:20 68:17,22
  69:3,11,22
  71:5,9,13 72:2
  72:17 73:1
  74:9,15,18
  75:11 76:3,16
  76:17
**exhibits** 3:7,8
**existence** 58:4
**expires** 82:17
**explain** 19:6,10
  22:25 23:2

26:18

**f**

**facebook** 3:14
  76:20,22 77:13
  77:24 78:3,13
  78:19 79:3,8
  79:20
**fact** 33:20
**facts** 70:15,16
  72:16
**false** 36:2,5
  70:20 71:2
**familiar** 19:11
  23:1
**far** 19:18 40:1
  58:6 78:12
**fax** 2:4,9,13
**fed** 22:21
**feel** 39:24
**feeling** 39:12
  39:13
**feelings** 50:10
**fees** 39:18 40:8
  50:5 74:4
**female** 32:20
  33:6 55:12
**field** 13:4 33:3
**fight** 65:17
  70:1,19
**fighting** 56:12
**figure** 11:15
  30:25 49:15
  55:14

**filed** 14:18 15:16 35:16,19 35:24 47:4

**filing** 15:8,11

**financial** 72:2,4 72:6,12,16,20 72:22 79:20

**financially** 4:14 66:8,15,20 68:2,15 77:14 77:20 79:2,13 83:14

**find** 54:19

**fine** 21:19 28:25 53:23 70:11 78:15

**finish** 7:18,24 9:1,5,16

**finished** 8:24

**firearm** 70:4,25

**firearms** 65:20

**firm** 2:2 4:9,11

**first** 5:15 16:12 22:6,14 32:8 32:20 33:6 36:18 43:5,16 45:14 49:18 50:11 55:12 57:8 58:8 59:17 64:21 77:1,8

**five** 75:1

**flip** 37:16 51:3

**florida** 1:1,15 2:4,8 4:7 10:4 15:9,12 26:10 26:13,23 29:9 46:25 47:7,19 47:23 48:1,4,9 48:19 49:2,4 82:2,6,16 83:2 83:5

**florida's** 65:19 70:3,23

**fogel** 73:11,14 74:10,17

**follows** 5:16

**forces** 14:5

**foregoing** 83:8

**forever** 23:7 28:1 29:22

**forgotten** 34:5 34:9

**form** 3:11 38:3 68:23 69:12,17

**forth** 44:4,5

**fought** 55:19

**foundation** 74:19

**four** 45:14 46:21 49:18 50:11 58:2

**freedoms** 65:18 70:2,20

**freezes** 71:21

**full** 6:1,23 12:7 12:11

**fully** 8:24 44:5

**further** 16:23 83:10

**g**

**g** 4:1

**gain** 66:16

**gears** 18:8

**general** 13:2,3 13:5 28:17 57:11

**georgia** 12:24 13:1 26:22,23

**gestures** 6:18

**getting** 47:2

**give** 5:10 28:17 52:13 53:1,9 53:14,22 54:22 57:11 59:7,9

**given** 44:23 55:12 59:25

**giving** 35:10

**glass** 80:25

**go** 6:12 7:21 11:3 16:22 24:10 37:9 39:2 40:6 41:8 50:4,15 52:5 52:24 53:7 64:2,10 80:9 80:18 81:9

**goal** 19:24 20:1

**goals** 18:13,17

**god** 80:16

**goddamn** 13:15 27:3 37:5 45:23 51:16 53:20 54:17

**goes** 7:22 45:16

**going** 7:20 8:10 10:14 11:17 23:16,18 24:1 24:2 31:11 35:3 36:18,19 39:5,13,16,17 40:1,3,6,7 45:5 46:4 47:13,14 47:20 48:13,20 49:12,14 50:3 50:4,13 60:2 68:8 69:21 71:22 73:24 74:2,4,5 76:6 76:13 80:15,24 81:6,10

**good** 4:2 5:19 32:4

**graduated** 16:11

**grand** 75:1

**grassroots** 65:20 70:4,24

**great** 58:21 59:1,4,8,12,16 59:24 67:6

**greg** 1:16 4:11 82:5,15 83:5

**[greg - hot]**

83:19

**ground** 6:13 29:16,17

**grow** 9:22

**guess** 68:20 69:6

**guessing** 79:23

**gun** 30:2,22 31:2,12 55:14 56:17 57:4

**guns** 30:7,11 78:4,9,11

**gut** 59:20

**guy** 64:3

**h**

**hammer** 1:4,10 3:2,11,12 4:5,6 5:2,4,14,19 6:3 6:4,8 7:10 8:3 8:14 9:10,19 9:22,25 10:8 10:16,22 11:12 11:23,25 12:9 12:13,17,18 13:20 14:5,17 14:23 15:16 16:4,22 17:12 18:3,7 21:5,12 21:21 22:1,16 23:22 24:18 26:17 27:4 29:7 31:20 32:13 34:22

35:3,10 36:13 37:8,25 38:11 38:17 39:7 40:5,17,25 41:16,20 44:1 45:6,12,15,21 49:8 50:22 51:17 53:18 54:11 55:3,5 55:11 57:7,8 57:15,17 58:7 60:4 62:10,20 63:2,17 64:17 65:15,16,21 69:21 70:1,5 70:25 73:18,21 75:25,25 76:15 77:1 78:14 80:2,11,25 81:10 82:7 83:7

**hammer's** 48:3

**hand** 5:8 35:4,5 45:15 57:21

**handing** 36:13 55:3 64:16 76:15

**handle** 19:14

**hang** 36:18

**happen** 64:1

**happening** 64:2

**hard** 33:19,22

**harlon** 18:22 19:20 20:5,7,8

20:25 25:9 27:13 31:13 43:19 55:1

**harm** 79:11

**harmed** 67:18 67:22 68:1,4 68:11 71:12,17 71:18,24 79:7 79:9,12,13

**hayden** 2:6 3:3 4:22,22 5:3,18 5:20 9:4,9 11:11,16,20,24 13:19 15:5,15 17:11,21,25 18:1 20:14 21:12,18,20 23:21 24:17 35:3,7,9,15 36:13,17,20,22 37:1,7 38:5,7 38:11,13 39:15 39:25 40:4,24 41:8,15 45:11 46:3,7,10,16,22 47:2,5,9,11,13 47:20,23 48:2 48:7,11,15,22 49:1,3,8,16,21 50:2,15,21 51:2 53:17 54:10 55:3,8 60:4,8 64:5,16 64:20 73:20

76:15,19 79:25 80:6,8,14,24

**he'll** 9:8

**header** 48:15

**hear** 34:6 53:11

**heard** 21:23 55:9

**held** 16:15 22:11 23:5,9 25:3 33:13

**hell** 20:11 21:22 24:6 52:14 71:21

**hh** 82:17

**historical** 33:7 55:14

**historically** 32:24 65:25 66:1 70:15 77:10

**history** 16:5 46:18 55:12 61:22 62:1,6

**hold** 16:11 21:16 25:7 34:15

**holding** 16:19

**home** 9:24 10:6 10:7,13

**honor** 60:20

**honored** 63:7,9

**honors** 34:23

**hot** 80:3,4

| | | | |
|---|---|---|---|
| **hour** 53:12 | **important** 23:17 | **j** | **key** 29:8 33:10 |
| **hours** 53:6 | **imprisonment** 14:11 | **jackson** 2:7,11 4:24 | **kill** 18:23 |
| **house** 10:15 | **inaccurate** 32:6 36:2,5 | **jacksonlewis....** 2:9,14 | **kind** 24:21 |
| **hunting** 32:8 | **inappropriate** 80:12,14 | **jacksonville** 2:8 | **king** 10:12 |
| **i** | **include** 36:2,5 | **jeremy** 2:11 4:24 | **kiss** 21:14 |
| **idea** 57:12 | **included** 49:25 | **jeremy.schne...** 2:14 | **know** 10:2,14 13:9 14:1 |
| **identical** 46:20 | **includes** 38:25 65:24 | **job** 1:25 7:5,6 16:11,12,19 | 17:17 19:8,22 |
| **identification** 35:13 36:16 55:7 64:19 76:18 82:9 | **incorporated** 37:3 | 22:6,11 23:5,8 24:20 25:3 26:4,19 32:16 32:18 | 20:11 21:22 22:20,20,22 24:19 26:16 28:15,15,16,25 |
| **idiot** 65:7 67:11 | **index** 3:7 | **jobs** 16:15 | 29:1,4,5,19 30:2,25 34:25 |
| **ila** 18:15,16,19 18:20 19:4,12 19:12,14,25 20:4,6,20,23 21:5 22:3,6,8 22:11,23 23:2 23:5,9 25:3,8 25:12,20 26:5 29:9 | **influenced** 65:17 70:1,19 | **jog** 58:6 | 38:6 39:21 42:24 44:10,15 48:17,20,24 51:4,16 52:3 52:13,15,21 53:2,4,21,25 54:2,3,8,19,20 55:24 56:8,10 56:13,20,23,23 57:1,3,25 58:14,17,18 59:10,11 61:4 61:12,14,25 63:12,14 64:3 64:9,10 65:10 66:15,22 67:1 67:16 68:5,19 69:5,6,7,8,8,9 69:16,19,19,24 70:16,21,21 |
| | **information** 22:22 54:20 65:25 77:10 | **john** 43:7 | |
| | **initiatives** 33:10 | **join** 77:19 | |
| | **instance** 52:22 | **joined** 69:10,17 75:10,16 76:2 | |
| **image** 41:25 42:7,11,16,17 42:22 43:1,6 43:14,21 44:21 49:11 50:1 51:8,12,23 52:3,16,22 54:4,25 62:22 63:16,18 64:23 65:3,6 66:16 | **institute** 18:21 | **judge** 75:23 | |
| | **intelligent** 68:7 | **jury** 19:11 23:1 26:19 37:13 | |
| | **interested** 4:14 83:14 | **k** | |
| | **internet** 18:4 | **kayla** 12:5,13 | |
| | **interruption** 23:11 79:24 | **keep** 7:3 18:11 20:2 26:7 68:9 | |
| **impair** 8:6,11 26:7 | **involved** 14:21 15:3,20 16:7 | **kennel** 10:13 | |
| | **issue** 39:10,23 43:1 48:18 | **kept** 16:23 | |

**[know - marion]**

71:3,7,8,11,17
71:25 72:1,5,7
72:19,24 74:6
74:8,12,14,16
74:25 75:5,6,8
75:16 76:8
77:22 78:7,15
78:16,17,18,20
78:22,22,22
79:6,17,19,22
**knowledge**
36:1,4 52:9
70:17
**known** 6:4,7,8
6:9 77:2
**knox** 20:6,19
20:25 21:2,4
22:3 59:19
**kozuch** 25:13
25:16,19 43:7
43:15

**l**

**l** 2:6
**latest** 81:5
**law** 2:2
**lawsuit** 14:17
14:18,21,23
15:4,19,19
16:3 22:16
23:23 24:2
35:17 61:25
**lawyer** 24:7

**laying** 30:8
**lead** 31:8
**leadership**
55:13 65:22
70:5 71:1
**leading** 47:17
**learn** 16:4 77:2
**leave** 25:14
33:4 39:16
40:5 74:2
**leaving** 39:5
68:8 73:25
74:1 75:25
76:1
**led** 47:15 49:10
**left** 10:15 57:21
**legacy** 56:1
**legal** 4:10,11
19:18
**legislation** 26:6
26:9 29:8,13
29:21 65:19
70:3,24
**legislative**
18:21 19:14
27:16,22 28:8
34:17
**legislature**
15:12 18:24
**leon** 82:3 83:3
**lewis** 2:7,11
4:25
**license** 13:21
13:24 82:8

**licenses** 13:25
**life** 8:10 16:25
55:21
**light** 69:25
**likeness** 41:25
42:3,7,11,16,17
42:22 43:2,6
43:15,21 44:21
49:11 50:1
51:8,12,23
52:4,6,16,22
54:4,25 62:22
63:16,18 64:23
65:3,6
**line** 7:17,23
**lisa** 73:13,14
74:10,13 75:4
**listed** 57:20
**listening** 54:18
**lists** 58:1
**little** 16:4 18:8
26:2 36:10
**live** 10:1,8
**lobbyist** 22:7
23:7,8 25:4,8
25:12 26:5
29:9 55:17
65:18 70:2,23
**located** 10:3
**long** 18:2,4
44:10
**longer** 23:14
36:10

**look** 45:1,14,25
46:4,23 49:19
49:22 50:11
57:14 65:14
69:23 76:12
**looking** 71:5
**looks** 58:1
**lot** 22:22
**lying** 81:13

**m**

**ma'am** 5:7
11:20 51:1
**made** 50:9 56:6
67:24 68:11
**maf** 1:3 4:8
**maiden** 6:11
**major** 13:3,4
**make** 6:20 7:4
7:6 26:18
45:19 72:14
**man** 20:8
**managing**
56:17
**marathon** 7:12
**march** 1:11 4:3
82:7,10,17
83:16
**marie** 73:11
74:10
**marion** 1:4,10
3:2,11,12 4:5,6
5:2,14 6:3,8,9
9:5 17:22

**[marion - notary]**

21:15 23:12 38:11 39:11 55:5 57:8,16 58:7 62:10,20 63:2,16 65:16 69:25 76:25 82:6 83:7

**marked** 35:10 35:12 36:14,15 55:4,6 64:16 64:18 76:16,17

**married** 6:9 10:16,18,20 11:12,13,22

**mason** 12:13

**matter** 4:5 57:3

**matters** 19:15 27:16

**mean** 17:3 32:11 33:18 46:20 51:15,16 51:18 58:16,20 63:13 79:25

**means** 19:6 29:15,25,25

**media** 33:3

**medical** 39:10

**medication** 8:4

**member** 27:4 28:22 29:1,5 67:7 69:11 75:11

**members** 19:17 20:2 69:19,20

**membership** 66:17,21 72:23 76:3 79:3

**memory** 33:16 33:17 58:6

**merely** 48:15

**met** 5:19

**microphone** 5:4 21:13

**middle** 7:16,17 7:22

**mike** 17:8 23:19 28:15

**military** 14:4

**millions** 68:16 68:18

**mind** 23:19

**mission** 18:9,10 19:24 20:1

**moment** 18:16

**money** 59:20 67:24 68:11,22 69:3 72:14,25 73:8 74:9,14 74:17,19 75:6

**monroe** 1:14

**morning** 4:2 5:19 8:7,12 9:15 24:5

**mouth** 57:6

**move** 39:16 50:4

**moved** 18:23

**mphammer1** 17:24

**n**

**n** 2:1 3:1 4:1

**name** 4:9 5:20 6:1,5,7,11 12:16 14:23 33:20,21 41:25 42:3,6,11,16,16 42:22 43:1,3,6 43:14,21 44:21 49:11 50:1 51:8,12,20,22 52:3,16,22 53:5,7 54:4,25 58:23 62:21,23 63:1,10,16,18 63:20 64:11,23 65:3,6 66:5,16 67:23,24 68:21 69:2,10,16 72:24 73:7,18 75:10 79:16

**named** 10:13 60:1,21

**names** 12:7,12 57:21

**naming** 63:8

**national** 1:7 4:6,23 5:21

**navigating** 46:11 48:16

**neal** 20:6,19,25 21:2,4 22:3 59:19

**need** 7:10 11:18 21:11 25:14 39:11 56:10 61:25 76:1 80:15

**needed** 7:12 11:16 27:15 56:8

**never** 14:12,13 14:21 15:14 19:2 21:23 30:20,25 42:2 42:13 44:23 62:13 64:8 65:13

**news** 55:25 56:8 61:16,19

**newsworthy** 33:2,7 55:22 56:5,6 60:24 61:7,11,22 62:1,6

**nil** 63:18

**nod** 6:19

**nomination** 3:11 68:23 69:4,12,17

**north** 1:14

**northern** 1:1

**notary** 82:6,16 83:5

**[notes - pages]**

**notes** 83:9
**notice** 8:23
**noticed** 36:24
**noticing** 4:20
**notify** 62:9
**nra** 3:14 5:24
14:19 16:7,10
16:14,20 17:5
18:8,15,17,19
19:3,16,21,23
20:3,9,10
22:17,18,23
23:23 27:4,14
27:17 28:11,14
28:22 29:2
30:19 31:21,23
32:17,18,20
33:7,12 34:8,9
34:12,14,15,23
39:3 41:24
42:3,6 43:13
44:20 51:7,11
52:6,6 55:12
55:13 56:6
58:21,23 59:2
59:4,12,20,25
62:9,13,19,19
63:15 64:11
66:8,14 68:11
68:14,22 69:3
69:10,17 70:16
70:21 71:6,8
72:1,19,25
74:9,14,17,19

75:10,11,16
76:2,3 77:14
79:2,3,19
**nra's** 18:9,10
18:13,17 41:23
44:19 51:6
58:21 77:1,8
**number** 4:7
59:13
**numbered**
37:18,19,20
**numbers** 48:11

**o**

**o** 4:1
**oath** 3:4 4:13
82:1
**objections** 4:18
**obtain** 12:25
**obtained** 13:12
**obvious** 9:18
**obviously** 6:14
21:24 58:5
61:4
**occurred** 16:24
33:23,24 52:4
**office** 33:13
**okay** 6:1,11,21
7:15 8:2 12:14
13:6,11 14:2
19:24 20:7,12
20:17,23 21:21
22:5,10 25:6
25:10,16 26:2

26:23 27:1,24
28:5,22 29:7
29:18 30:9
31:1,16,20
32:5 33:14
34:2,18 36:1
37:24 38:14
41:20 42:5,10
42:25 44:8,24
56:7,16,25
57:24 58:6,13
58:22,25 59:7
59:15,18,22,24
60:19,20 61:14
61:21 62:8,16
63:11 66:3,18
66:23 67:17
68:6,10,14,21
69:2 70:13
71:4,8 72:1,15
72:24 74:13,25
75:2,8 76:9,25
77:20 78:12,18
79:6,11,15
**old** 15:25 16:13
21:16 33:19
**once** 42:12
63:19 71:19
**ones** 27:22,22
46:25
**ongoing** 65:13
**online** 3:11
51:14,15 52:5
52:24 53:7

64:2,11 68:22
69:4,11,17
**operate** 26:10
26:12
**operated** 27:1
**opinion** 67:3,10
78:7
**opportunity**
40:17
**opposed** 6:18
**orally** 6:18
**order** 24:3
**organization**
67:7,8
**outcome** 4:15
**owed** 30:20
**own** 10:6,6,7,7

**p**

**p** 1:4 2:1,1 3:11
3:12 4:1 38:11
55:5 57:8,17
58:7 62:10,20
63:2 65:16
70:1 77:1
**pack** 25:14
**page** 6:14
37:16,20,21
38:9 41:19
44:2 45:16,17
48:17 57:14,15
**pages** 37:18
45:14,24,25
49:18 50:11,12

83:8
**paid** 27:10
30:20,21,24
31:2,11 67:23
67:25 68:12
79:10,14
**pain** 15:25
**paragraph**
41:18,19,22
44:2,3,8,11,13
44:14,16,18,18
51:3
**paragraphs**
44:4
**park** 2:3
**parkland** 15:2
**part** 34:20 36:8
43:24 69:8
**particular**
45:13 53:4
**parties** 4:13
83:11,12
**pass** 26:9
**passage** 65:19
70:3,23
**passed** 26:6
**pay** 42:14
**paying** 13:23
**payment** 19:1
**pc** 2:7,11
**pending** 14:15
**people** 6:19
18:11 23:1
26:7 56:8,10

56:13,14,20,23
57:3,23 58:2
59:20 70:19
78:18
**people's** 56:17
**period** 14:13
30:19 44:23
63:20
**permission**
42:2,13 44:23
62:24 70:17
79:18
**person** 58:15
58:16,20 68:21
69:10,16 72:25
73:7,14 75:10
75:16
**personal** 17:12
**personally**
18:22
**physical** 6:18
**pick** 21:18
**picture** 51:20
52:6 53:7
**piece** 29:13,20
**pieces** 29:8
**pile** 76:12
**pl** 2:2
**place** 1:13 31:4
32:8 42:23
79:3
**placed** 76:3
**plaintiff** 1:5 2:5
44:3

**plaintiff's**
41:25 42:1
44:21,22 51:8
51:9
**plan** 19:2
**please** 4:16,19
5:8 6:1 7:11
9:5,20 12:7
17:16 21:13
24:9 36:10
37:17 39:25
41:17,19 46:1
49:19 50:23
51:3 54:13,14
54:14 57:15
60:5 65:15
**pockets** 59:21
**point** 7:10
10:18 62:8,18
80:10
**policy** 27:22
28:8 34:17
57:22
**position** 22:6
23:8,9 25:3,7
27:10
**positions** 22:11
23:5 34:15
**possess** 14:2
**post** 3:14 76:20
76:22,23 77:13
77:24 78:3,9
78:13,19 79:3
79:8,12,20

**preparation**
8:18 9:11
**prepare** 8:15
**prepared** 21:24
23:19
**present** 2:16
4:16
**preserve** 65:17
70:1,19
**presidency**
34:11,14
**president** 20:19
20:21 31:21,23
32:17,18,20
33:6,11 34:8
34:16 55:12
57:13 59:17
77:1,9
**pretends** 28:16
**pretty** 50:10
69:25
**price** 6:3,10,11
**primarily**
26:10
**primary** 26:4
26:24,25 27:22
32:16,18 78:10
**prior** 42:10
**privileged**
58:15,16,20
**privy** 48:21
**problem** 33:16
33:17 43:3

| | | | |
|---|---|---|---|
| **problems** 42:22 | **purposes** 17:18 | 21:10,24 22:20 | **read** 35:19,23 |
| **proceeding** 4:19 | 46:11 48:16 | 22:21,24,25 | 44:8,11,13 |
| **proclaimed** | 61:24 | 23:17,18,24 | 51:4 66:1 |
| 61:15 | **pursuant** 37:22 | 24:3,5,20,23 | 69:25 70:10,12 |
| **produced** 82:8 | **put** 21:12 31:4 | 26:17 31:6,8 | 77:7 |
| **profanities** | 47:18,18,19 | 36:20 37:1,6 | **reading** 35:21 |
| 81:3 | 48:9 57:5 | 38:18,23 39:4 | **reads** 41:22 |
| **program** 30:3,6 | 59:21 60:2 | 40:6,11,12,14 | 44:3,18 51:6 |
| 30:9,13,22 | 64:11 | 40:15,16,18,18 | 65:16 |
| 31:3,12 59:14 | **putting** 23:13 | 40:19,22 41:1 | **ready** 80:18 |
| **programs** 42:4 | 36:9 | 44:25 45:2,5 | **rear** 15:25 |
| 52:7 | **q** | 45:21,22,23 | **reason** 22:24 |
| **promote** 42:3 | **qualifications** | 46:4,13,16,17 | 32:5 72:9,11 |
| 66:13 | 3:13 | 46:23 47:11,13 | **reasonable** 7:1 |
| **promoting** 52:6 | **question** 6:24 | 47:14,20 48:7 | 7:13,14,19 |
| 61:10 | 6:24,25 7:1,16 | 48:13 49:9,15 | **reasons** 65:2,5 |
| **prosecute** 24:1 | 7:23 8:24 9:2 | 49:23 50:3,5 | 65:11 |
| **protect** 18:10 | 9:16 16:9 | 52:9 53:19 | **recall** 15:6,8,11 |
| 20:1 56:14,17 | 19:10 22:1 | 54:16 60:5 | 15:19 25:25 |
| **proud** 33:5,8 | 31:10 36:7 | 64:15 68:7 | 26:1 29:20,23 |
| 33:12,13 | 45:9 49:12 | 69:22 74:6 | 30:15 32:13,19 |
| **public** 20:2 | 52:12 54:11,12 | 75:21,22,24 | 34:13,22 35:1 |
| 82:6,16 83:5 | 54:17 60:7 | 78:23,25 | 35:21 58:10 |
| **publish** 77:18 | 61:1,3,5 62:2 | **quicker** 10:22 | 64:6,13 |
| **puke** 68:8 | 71:23 72:18 | **r** | **received** 34:23 |
| **puking** 68:9 | 73:21,23 76:7 | **r** 2:1 4:1 | 55:21 68:15 |
| **pull** 51:19,19 | 76:21 | **raise** 5:7 | 72:1,6,11,16,19 |
| 53:7 | **questioning** | **randy** 25:13,16 | 79:19 |
| **punishable** | 7:17,23 | 25:19 43:7,15 | **recess** 11:8 |
| 14:9 | **questions** 6:18 | **rcoates** 2:5 | 24:14 41:12 |
| **purpose** 26:17 | 7:8 10:23,25 | **rcoateslaw.co...** | 50:18 80:21 |
| 66:8,24 71:6 | 11:14,21 12:21 | 2:5 | **recipients** |
| 77:14 | 16:3 17:9 19:9 | | 57:16 |

**recollection**
  24:24
**record** 4:3,18
  5:21 6:2,20
  11:4,7,10,13,16
  14:25 16:24
  17:19 23:22
  24:11,13,16,18
  26:18 39:7,9
  41:9,11,14,22
  49:21 50:15,17
  50:20 67:12
  79:25 80:18,20
  80:23,24 81:14
  81:16 83:9
**redact** 48:11
**reeves** 2:17 4:9
**refer** 5:23
**refuse** 40:6
**refuses** 47:21
**refusing** 39:4
  40:13 41:4,5
  45:8 49:22
  71:23
**regard** 30:22
**regus** 1:13
**reilly** 26:21
**reimbursement**
  39:18 40:7
**related** 4:13
  19:4,13 46:8
  49:23,24,25
**relationship**
  19:3

**relative** 83:10
  83:12
**relief** 81:6
**remember** 15:7
  15:10,13,24
  16:13,17,18,19
  27:21,23 28:4
  28:5 29:10,11
  31:24,25 33:15
  33:19,20,23,25
  34:1,11,20,21
  43:12,24,25
  57:10 74:24
**rent** 10:6
**report** 83:7
**reported** 1:16
**reporter** 3:5
  4:11,21 5:5,7
  5:13 6:16 35:6
  35:8 82:5 83:1
**reporter's** 7:4
**represent**
  36:17 38:19
  70:13
**represents** 17:5
  17:7
**request** 58:21
**required** 75:20
**reset** 39:17
  40:8
**reside** 9:25
**resigned** 27:8
**restates** 44:4

**reston** 2:13
**result** 81:4
**review** 9:10
**rhonda** 12:3
**richard** 2:2 5:1
**rifle** 1:7 4:6,23
  5:21
**right** 5:8 8:11
  18:7,10,22
  20:1,20 21:17
  24:18 25:4,24
  26:7 27:7 32:3
  32:13,16,21
  33:6 35:3,17
  38:9,16,17
  42:12,18,20,23
  43:2,13 45:6
  45:12,15 51:4
  52:9,13,17
  53:12,24 54:1
  54:23 55:19
  57:21 58:11
  59:11 60:24,25
  61:6,9,11,13,15
  61:18 63:8,20
  64:2 65:19
  68:12 70:3,23
**rights** 49:11
  55:15,18 56:4
  56:12,15,18,22
  57:3,4
**ring** 14:24
  29:16

**riverside** 2:7
**role** 61:9,22
  62:1,6 65:18
  70:2,22,23
**roman** 59:23
**room** 4:16
**rude** 81:1
**rules** 6:13
**run** 7:11

**s**

**s** 2:1,11 4:1
**safe** 30:2,22
  31:2,12
**safety** 30:9
  65:21 70:5,25
**sake** 6:20 51:5
**sally** 12:3,5,8,9
**sanctions** 80:10
**sat** 35:14
**saw** 58:3
**saying** 44:24
  79:11
**says** 37:21
  45:16 57:16,18
  70:14,14,18,21
  70:22,22 76:25
**scheduled** 8:21
**schneider** 2:11
  4:24,24 11:2,5
  24:8,10 41:7
**school** 30:6
  59:14

**[screaming - stenographic]**

**screaming** 81:2
**second** 55:18
  55:18 56:4,17
  57:3 60:23
  61:6,10 65:17
  70:2,19 77:3
  80:2
**section** 37:22
**see** 6:19 7:22
  26:6 30:7
  37:12,14,15,21
  37:23 42:1
  44:6,7 45:9,15
  51:9,10 57:16
  57:17,19,20
  58:2 65:22,23
  70:6,7
**seek** 50:5 74:4
  80:10 81:6
**seem** 31:4
  33:15 54:18
**seen** 21:23
  76:20,22
**select** 57:22
**selling** 78:14
**send** 77:18
**sense** 55:14
**sent** 35:21 71:8
**separate** 16:9
  16:20 19:18,23
**serve** 27:17,20
  27:24 28:2,9
  31:20

**served** 14:4
  28:5 32:10
**serves** 66:7,25
  71:5 77:13
**set** 44:4,5
**settle** 13:16
**seventies** 21:5
**several** 50:9
  67:12
**sheets** 35:7
**shorter** 24:22
**shorthand** 82:5
**show** 26:2
  72:16
**showed** 13:22
**shut** 24:6 52:14
**sick** 39:5,9,11
  39:20,22 41:6
**side** 57:21
**sign** 38:2
**signature** 38:8
  82:15 83:19
**signed** 37:24
  82:10
**significant**
  29:13 32:24
**similar** 69:21
**simple** 53:9
**simply** 5:23
  45:22
**single** 16:19
  51:22 52:3,15
  52:22 53:2
  54:8 68:21

  69:10,16 72:24
  73:7 75:10,16
**sir** 36:22
**sit** 21:8 23:12
  36:4 40:25
  52:13,17 53:25
  54:7 76:13
**sitting** 19:9
  21:6 58:19
  64:14
**skip** 37:10
**smart** 11:15
**smith** 1:16 4:11
  82:5,15 83:5
  83:19
**sold** 67:2,5,9,14
  77:23 78:2,8
**solutions** 4:10
  4:12
**somebody**
  22:21 27:15
**sorenson** 14:23
**sound** 7:1,13
  7:18 25:24
  32:2
**sounds** 7:14
  32:4
**south** 9:23
**speak** 8:18
**speaking** 50:8
**specific** 13:4
  64:6
**specifically**
  44:3 74:12

**specificity**
  29:23 53:2,3
  53:15,22
**speedier** 24:25
**spoken** 61:19
**squat** 22:20
  31:9
**stack** 49:2
**stalking** 15:1
**stalling** 9:7,18
  16:2 25:1
  36:11
**stand** 29:16,17
  33:25
**stands** 51:21
**start** 21:4
**started** 5:3 6:12
  20:11 22:2,5
**starting** 22:12
  22:14
**state** 4:17,19
  6:1 11:13 12:7
  82:2,6,16 83:2
  83:5
**stated** 11:12
  12:10 66:23
  67:12 68:3
  78:21 79:1
**statements**
  36:2,6 77:7
**states** 1:1 26:12
  26:22,24,25
**stenographic**
  82:5 83:9

[stenographically - throw]

stenographic...
1:16 83:7
step 11:2 24:10
stickers 35:4
stop 31:17
39:11 54:13
stopped 25:11
straight 7:21
street 1:14
stupid 10:25
21:10 38:1
40:14 53:16
54:9 64:15
65:4,7 72:8
75:22,24,24
77:22,25
succeed 56:16
sued 22:16
suite 1:14 2:3,8
2:12
summarily
42:19
sunrise 2:12
supernaugh
73:13,15,18
74:10,13 75:4
supposed 19:14
30:21,24 31:1
42:14
sure 35:8
suspend 39:23
suspended
81:17

swear 4:21 5:9
switch 18:7
sworn 5:15
32:9 82:8

**t**

t 1:16 82:5,15
83:5,19
take 7:12,15,18
7:20 8:8 11:1
23:12,23 24:8
41:7,8 45:14
49:19 50:11,13
59:20 80:9
taken 4:5 8:3
takes 12:6,13
talk 8:21 24:6
talking 7:3
28:24 61:21,25
62:5
tallahassee 1:2
1:13,15 2:4
10:3 18:23
tara 26:21
taught 30:6
teach 30:11
tell 8:14 9:19
12:22 17:15,19
17:22 18:9,20
19:4,12 21:21
25:6 26:4,20
27:7 28:11
29:7,25 31:10
33:10 34:22

43:5,9,13,20
46:24 49:14
51:11,17,21
52:1,2,16,19
54:3 57:7
58:13 59:11
62:8 63:9
64:25 65:10
66:11,14 67:17
67:21 68:14
69:15 71:15,18
73:4,5,19
75:15,19 77:17
77:23
telling 26:16
39:7 54:21
74:2 76:5
79:16
tenure 34:8
termination
52:23 62:18
71:10
testified 5:16
59:5
testify 8:6,11
testimony 3:2
5:9 15:18,22
15:23 16:18
32:14 42:8
54:24 57:2,5
78:12 79:4
texas 26:21,23
thank 5:13 8:2
17:25 35:9

38:16 81:12
thing 7:15
53:20 59:8,12
things 33:25
34:1,3,7 55:19
58:21 59:1,4
59:24
think 16:1,1
21:23 23:18
24:22 27:9
30:16 31:17,18
32:9 50:9
56:20 61:12,18
61:25 62:25
65:2,5 67:17
67:21 70:18
71:12,24 76:10
78:7 79:7
80:10,15,16,17
81:5,9
thinks 17:9
23:20 75:23
third 57:14
thought 56:15
62:21 63:5,7
threatened
55:21 56:24
threats 55:21
three 12:1 35:7
75:3
threw 80:25
throw 39:5,14
80:3,4 81:3,10

**[thrown - verified]**    Page 19

**thrown**  80:6,8
**tight**  21:8
**time**   1:12 4:3
  4:19 7:14
  10:21 11:6,9
  15:6 24:12,15
  24:22 25:21
  28:3,10 41:10
  41:13 44:10
  50:16,19 52:24
  53:2,5,6 60:9
  60:17,18 62:8
  64:6,10,12
  65:8 80:2,19
  80:22 81:15
**times**  50:9
  55:22 67:12
**timing**  63:14
**title**  34:18
  37:12
**titled**  55:4
**today**  6:16 8:20
  15:18 36:5
  80:11 81:8,12
**today's**  8:15
**told**  11:14
  16:17 25:14,17
  31:1,11 43:4,7
  52:11,18,20,20
  52:21 53:6,25
  54:2,6,20,23
  60:14,18 61:16
  62:7,13 65:9
  65:12 67:14

**tom**  32:7
**tone**  80:14
**took**  22:9 32:7
  43:10,15
**top**  37:20 45:15
  48:11 57:16
  65:14,16 69:24
  70:8 76:25
**topic**  60:24
  61:7,11,22
  62:1,6
**touch**  30:7
**transcript**  6:23
  83:8
**treated**  14:19
  14:20
**trial**  37:14
**tried**  80:2,3
  81:3
**true**  77:8 83:9
**trust**  81:9
**truth**  5:10,11
  5:11
**truthfully**  8:7
  8:12
**try**  39:23
**trying**  22:2,17
  24:19 36:12
  54:19 57:5
  68:8
**tuesday**  1:11
**turn**  38:22
  41:18 44:16

**two**  12:11 13:7
  32:10
**typed**  38:9
**typing**  6:16

**u**

**unauthorized**
  62:21 63:18
  64:22 65:3,6
  65:12
**undergraduate**
  12:23
**understand**
  5:23 7:7,21
  18:12,14,17
  19:19 22:2,17
  28:20 31:5,7,8
  33:16 34:21
  36:8 39:19
  40:5,9,10
  43:25 44:24
  45:18,20 47:24
  50:6,7,8 52:8
  53:8 69:9 74:4
  74:5 75:20,22
  76:6 79:4
**understanding**
  18:9,13 25:2
  28:17 47:16
  51:5 58:25
**understood**  7:9
  11:19 12:20
  16:5 27:15
  76:14

**united**  1:1
**university**
  12:24 13:1
**unused**  64:8
**usc**  37:22
**use**  41:24 42:2
  42:15 43:6,14
  43:21 44:20
  51:7,12,22
  52:3,15 54:4
  54:25 62:21
  63:1,10,13,15
  63:20 64:22
  65:3,6 66:5,16
**used**  42:6,11,16
  52:23 55:1
  58:23 62:23
  64:6 67:23
  79:16
**using**  42:22
  43:1,3 67:24

**v**

**v**  4:6 14:23
**valley**  2:12
**various**  38:21
  57:20 81:2
**vehicles**  14:2
**verification**
  37:22 38:3
**verified**  37:13
  38:14 41:18
  50:24

**[veritext - youth]**

**veritext** 4:9,11
**video** 77:2,5
  80:1
**videographer**
  2:17 4:2,10 5:6
  11:3,6 21:19
  24:12,15 41:10
  41:13 50:16,19
  80:18,22 81:15
**videorecorded**
  1:10 4:4 6:15
**viewed** 78:18
**violations**
  49:10
**virginia** 2:13
  36:24 46:6,17
  47:22 48:1,5,8
  48:20,23,25
  50:14
**volunteer**
  27:13
**vp** 32:8
**vs** 1:6

**w**

**walk** 22:10
  59:21
**want** 7:21 11:3
  14:25 16:4,22
  24:4,6 37:9
  43:6,14,20
  44:25 47:18
  49:7 53:3,20
  56:13 63:14

65:4 75:15
78:6,7,15
**wanted** 56:14
  59:20
**washington**
  32:7
**wasting** 7:14
  10:21
**watch** 77:1
**watched** 77:5
**water** 68:9 80:8
  81:1
**way** 7:3 10:2,11
  14:19 45:16
  62:20 66:9,21
  67:18 68:1,4
  71:6,12 77:15
  77:21 79:8
**ways** 51:11
  68:10 79:1
**we've** 24:20
**went** 80:25
**willing** 24:4
**wise** 63:14
**witness** 4:21
  5:12 9:7 11:9
  11:22 13:18
  15:3 17:4,7,24
  21:6,9,14,16
  23:13,16 35:5
  35:14 36:9,11
  37:5 38:6,12
  39:13,22 40:1
  40:21 49:6,14

49:21 53:16
54:9 60:2,6
64:3,14 76:12
80:4,7,13,16
81:13
**woman** 3:11,12
  55:5 57:8,17
  58:7,23 59:17
  62:10,20 63:17
  63:23 77:1,9
  78:10
**woman's** 61:22
  62:1,6
**women** 3:14
  61:10,12,14
  77:19 78:4,9
  79:3
**women's** 57:22
**won** 58:2
**words** 57:6
  63:13
**work** 16:5,10
  18:19,19 19:1
  20:3,25 21:2
  28:21 30:21
  31:2,12 34:8
  39:23 62:23
  63:18 67:7
**worked** 26:19
  26:21,21 29:8
  29:17,20
**working** 16:14
  16:15,19,20
  21:4 22:2,5

25:11
**workings** 27:15
**worst** 51:22
**write** 40:15,16
**written** 16:24
  55:25
**wrote** 17:9
  22:19 44:10

**x**

**x** 3:1

**y**

**yeah** 11:5 24:9
  36:20 52:12
  61:1 72:19
**year** 10:15 25:7
  25:11 28:5
**years** 13:7
  15:25 16:13
  18:5 21:16
  22:12 23:6
  25:23 31:23
  32:10 33:19
  34:24 43:22
  44:12 57:20
  74:22
**yelling** 54:13
  54:16 81:2,2
**young** 30:7
**youth** 65:20
  70:4,25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.